EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* MARÍA QUILES ALBINO, acusada y apelante.

Número 16288.

*Reasignado:* 4 de junio de 1961.  *Resuelto:* 23 de junio de 1961.

*William Morales Torres*, abogado de la apelante; *J. B. Fernández Badillo, Secretario de Justicia, Arturo Estrella, Secretario Auxiliar de Justicia* y *Alfredo Archilla Guenard, Fiscal, Tribunal Supremo*, abogados de El Pueblo, apelado.

EL JUEZ ASOCIADO SEÑOR DÁVILA emitió la opinión del Tribunal.

¿Se ha infringido el precepto constitucional sobre el debido proceso de ley al celebrarse el juicio de la aquí apelante ante el mismo magistrado que hizo la determinación de que había causa probable para su arresto? Es ésta la cuestión fundamental que plantea el presente recurso.

Ante el juez sentenciador en este caso prestó declaración jurada un agente policiaco con el fin de obtener una orden de allanamiento del hogar de la apelante. A base de esa declaración jurada el magistrado determinó que existía causa probable para el allanamiento y expidió la correspondiente orden. Consumada la investigación preliminar y con vista a la evidencia obtenida por el ministerio fiscal, el juez determinó que existía causa probable para el arresto. Final· mente, llamado el caso para juicio, presidió el mismo magis· trado la vista en la cual se halló culpable a la acusada de una infracción de la Ley Núm. 220 de 15 de mayo de 1948, comúnmente conocida como Ley de la Bolita, imponiéndole una condena de seis meses de cárcel. Tal es la situación de hechos en que se basa la apelante para sostener que sus derechos civiles han sido violados al privársele del juicio justo a que tiene derecho conforme a los dictados del precepto constitucional referente al debido proceso de ley. (1)

---

(1) La Constitución del Estado Libre Asociado de Puerto Ricó, en su Sección 7, Art. II, establece que "ninguna persona será privada de su libertad o propiedad sin debido proceso de ley . . . " Al incorporar este principio a nuestra Constitución se usaron las mismas palabras que aparecen en la Constitución Federal, en las constituciones de los estados y las que aparecían en la Carta Orgánica de 1917. En el Informe de la Comisión de Carta de Derechos a la Convención Constituyente se dijo que era un lenguaje consagrado históricamente, y claramente se tuvo el propósito de incorporar a nuestra ley fundamental toda la tradición histórica que el mismo entraña. *Informe, Comisión Carta de Derechos, Convención Constituyente* (1951).

Los requisitos establecidos por nuestra tradición constitucional para garantizar la rectitud y esencial justedad de los procedimientos en los casos de naturaleza criminal son abundantes y variados. Señalamos, por vía de ilustración meramente, los siguientes: derecho a asistencia de abo-

No es esta la primera vez que se trae ante nuestra consideración el problema constitucional que aquí nos ocupa. Ya anteriormente en *In re Marín Báez*, 81 D.P.R. 274 (1959), tuvimos ocasión de emitir juicio sobre la constitucionalidad de nuestra propia actuación—en un procedimiento para la destitución de un juez—consistente en estar entendiendo en el procedimiento de destitución no obstante el hecho de que previamente habíamos determinado la existencia de causa probable para la radicación de la querella.(²) Resolvimos que nuestra actuación no trasgredía las salvaguardas del debido proceso de ley, y al hacerlo nos expresamos así:

"En resumen, nunca ha sido ni es la norma constitucional que cualquier contacto previo con la prueba, no importa su alcance y efectos, incapacite a un juzgador para dirigir posteriormente los méritos de una controversia. En cada situación en que se alegue ese defecto constitucional hay que considerar la índole del procedimiento, el grado de relación del juez con la prueba y los probables efectos de esa relación sobre su desinterés e imparcialidad y calibrar esos factores a la luz de la entereza moral y la disciplina profesional que necesariamente debe tener cualquier juez que merezca ese nombre."

A tenor con la regla anteriormente expuesta resolvimos en *In re Marín Báez* supra, que, bajo la situación de hechos y de derecho específica que presentaba dicho caso, no estábamos incurriendo en una violación de los preceptos del debido proceso de ley al entender en la vista en su fondo del

gado; derecho a un juicio rápido y público; derecho a ser notificado de la naturaleza y causa de la acusación; derecho a carearse con los testigos de cargo; derecho a no incriminarse mediante una confesión involuntariamente obtenida; derecho a un juicio imparcial; y derecho a que el estatuto que impone la sanción penal no sea incierto, ambiguo o dudoso.

(²) Nuestra actuación fue de conformidad con las disposiciones de la sección 24 de la Ley de la Judicatura (4 L.P.R.A. sec. 232) según dicha ley estaba en vigor para aquella fecha. La Asamblea Legislativa luego modificó el procedimiento. Ley Núm. 60 de 19 de junio de 1959 (4 L.P.R.A. 232, Suplemento 1960, pág. 198). Claramente la Asamblea Legislativa al aprobar la enmienda tomó nota de lo expresado por nosotros en *In re Marín Báez*, escolio 21, a la pág. 287.

procedimiento de destitución. Lo que allí dijimos y resolvimos es igualmente aplicable al caso de autos.

¿Se menoscaba en verdad la imparcialidad de un juez por el hecho de que examine unas declaraciones juradas en las que se le imputa a una persona la comisión de unos hechos que de acuerdo con la ley constituyen delito público? ¿Se menoscaba acaso su imparcialidad porque previo al juicio conozca los detalles de la acusación, o porque a base de unas declaraciones juradas haga una determinación de la existencia de causa probable para el arresto del acusado?

En el caso de autos el juez a quo no examinó testigo alguno. Su participación consistió en examinar una declaración jurada para determinar si había causa probable para expedir una orden de allanamiento y posteriormente otra declaración para determinar si había causa probable para el arresto. Como no examinó testigo alguno, no hubo posibilidad de que en su mente quedara grabado nada de lo que pueda impresionar a un juez cuando oye y ve declarar a una persona. Su intervención preliminar en el procedimiento se concretó a la actuación esencialmente pasiva del juzgador que, en forma enteramente impersonal, examina unos documentos a los fines de determinar si los mismos son de suficiente peso para justificar que se decrete el arresto. No fue la suya la conducta activa y llena de celo del acusador que investido de la función de traer al delincuente ante el foro de la justicia, se da de lleno, con la fogosidad y dinamismo que su ministerio público exigen, a la tarea de reunir la evidencia necesaria para sostener la acusación que ha de radicar. Por otro lado en su concepto filosófico la imparcialidad del juez, en grado de absoluta, es meramente un ideal. El Juez Frank, lo ha expuesto con característica lucidez en *In re J. P. Linahan*, 138 F.2d 650, 651, (C.A. 2, 1943) : "La democracia habrá de fallar, ciertamente, a menos que nuestros tribunales decidan los casos justamente, y no puede haber un juicio justo ante un juez parcial e inte-

resado. No obstante, si 'interés' y 'parcialidad' han de definirse como que significan la total ausencia de concepciones formadas de antemano en la mente del juez, entonces nadie nunca ha tenido un juicio justo y nadie jamás lo tendrá." En *In re Marín Báez*, supra, aludimos al punto de vista sostenido por el Juez Frank e hicimos mención de distintas situaciones en que un juez que tiene conocimiento previo de los hechos y ha llegado a conclusiones basadas en los mismos, vuelve a conocer de ellos para fallar. A tal efecto dijimos, a la página 285:

" . . . En el procedimiento civil y criminal existen numerosas ocasiones en las cuales el juez que va a fallar el litigio en su fondo adquiere de alguna manera, en mayor o menor grado, conocimiento inicial de los hechos o se le exige que en principio acepte determinada apreciación de las alegaciones para sobre esa base asentar un criterio jurídico. Descontando la cuestión elemental de la 'imagen' que pueda forjarse el juez al examinar unas alegaciones bien o mal redactadas, pueden citarse, como ejemplos de lo anterior, sus dictámenes sobre mociones de desestimación, solicitudes de órdenes de entredicho, mociones de sentencia sumaria y de nuevo juicio y su participación en las conferencias anteriores al juicio (*pretrials*), en los actos de conciliación de ciertos casos de divorcio y en los innumerables incidentes provocados por los métodos modernos de descubrimiento de pruebas. Más aún, tanto en el procedimiento administrativo como en el criminal y el civil no es nula por deformidad constitucional la actuación de un juzgador que preside un nuevo juicio luego de haberse revocado el fallo que él dictara en el juicio anterior, cuando tuvo la oportunidad de conocer todos los detalles de la prueba."

Una situación de hechos parecida a la del caso de autos se le planteó a este Tribunal en *Pueblo* v. *Ruiz*, 58 D.P.R. 639 (1941) y resolviéndola, dijimos a la página 642, 643:

"Examinemos el incidente en que se basa el segundo señalamiento. De las instrucciones dadas por el juez al jurado, aparece que el acusado Maximino Piazza se presentó en la cárcel del distrito en la noche del crimen, diciendo que él había matado a Serrano, y que al siguiente día, que era un domingo, por la mañana, Piazza fue llevado por dos detectives a presencia

del Juez de Distrito, Sr. Todd, Jr., por no haber en Ponce en aquel momento ningún otro juez o funcionario judicial que pudiera fijarle fianza, y dicho juez ordenó su arresto y le fijó fianza para su libertad provisional. Aparece también, que habiéndole manifestado al juez los detectives que Piazza había prestado una declaración, el juez le tomó el juramento correspondiente.

"Ninguno de los hechos y circunstancias que acabamos de relatar incapacitaron al Juez Todd, Jr., para presidir la vista de la causa, ni le impusieron la obligación de inhibirse. El artículo 23, apartado 3, del Código de Enjuiciamiento Civil, impone al juez la obligación de inhibirse cuando hubiere sido abogado o consultor de cualquiera de las partes en el pleito o procedimiento pendiente ante su corte 'o fiscal en una investigación o proceso criminal donde los hechos sean los mismos que en el pleito sometido a su resolución.'

"De acuerdo con los artículos 12 y 13 del Código de Enjuiciamiento Criminal, los jueces de las cortes de distrito son magistrados 'con autoridad para dictar orden de arresto contra una persona acusada de delito público.' El artículo 44a del mismo código provee que 'en toda orden de arresto se fijará la cuantía de la fianza, la cual podrá hacerse efectiva y admitirse por cualquier juez'; y los artículos 32, 33 y 44 reconocen el derecho que tiene toda persona acusada de delito grave a que se le lleve sin demora a la presencia de un juez y a que éste le fije fianza.

"Resolvemos que las actuaciones del Juez Sr. Todd, Jr., se ajustaron al más estricto cumplimiento de sus deberes como juez; que en ningún momento actuó como fiscal; y que no erró en manera alguna al presidir la vista de esta causa."

Y en el caso de *Wilson* v. *Remfroe*, 91 So.2d 857 (Fla., 1956), se planteó una cuestión similar y la corte se expresó así al resolverla, a la página 860:

"Hemos examinado todas las decisiones citadas por las partes. No hemos encontrado ningún precedente decisivo en esta jurisdicción. Sin embargo, en nuestra búsqueda, hemos encontrado varios casos de otras jurisdicciones que sostienen que el mero hecho de que un juez haya participado en la investigación preliminar y ordene la radicación de una acusación, en sí no es suficiente para impedir que dicho juez actúe en la vista del caso. Esta parece ser la regla generalmente seguida en ausencia de

una demostración directa y precisa de parcialidad o prejuicio contra el acusado de parte del juez."

No obstante, al igual que ocurrió en *In re Marín Báez*, supra, en el caso de autos la apelante nos cita el de *In re Murchison*, 349 U. S. 133 (1945), en apoyo de su contención [3] de que se viola el debido proceso de ley cuando se celebra el juicio en su fondo ante el mismo juzgador que previamente ha hecho una determinación de causa probable en el procedimiento.

En *In re Murchison*, según lo analizamos en *In re Marín Báez*, "Murchison y White, los apelantes en el caso, comparecieron ante [un juez] a deponer sobre actividades de juego y de soborno oficial. Las contestaciones de Murchison convencieron al juez de que estaba cometiendo perjurio. Lo acusó por esa actuación y le ordenó comparecer ante él para mostrar causa por la cual no debería castigársele por desacato criminal. White se negó a contestar algunas de las preguntas que le hizo el juez, aduciendo que tenía derecho a asistencia de abogado antes de hacerlo. El juez lo acusó de desacato y le ordenó comparecer posteriormente. Luego el mismo juez les celebró un juicio público y les impuso una pena por desacato. El Tribunal Supremo de Michigan confirmó la sentencia y los acusados apelaron al Tribunal Supremo federal invocando, entre otras defensas, la garantía del debido procedimiento de ley. Dicho Tribunal, con la inconformidad de tres de sus jueces, aceptó el planteamiento de los apelantes y anuló la sentencia.

"Consideró el Tribunal Supremo que en las circunstancias descritas un juez no podía tener completo desinterés en la culpabilidad o inocencia de un acusado; que como cues-

---

(3) La apelante invoca además el art. 54 del Código de Enjuiciamiento Criminal Español de 1888 que establecía como causa de recusación el que el juez hubiera sido instructor de la causa y el 55 que le hacía mandatorio al juez el inhibirse. Aún suponiendo que estos artículos tuvieran vigencia, cf. *Ex parte Mauleón*, 4 D.P.R. 123 (1903) el juez de instancia no actuó como juez instructor. L. de S. 1-2.

tión práctica lo más probable sería que las impresiones adquiridas por el juez durante la vista secreta tuviesen más peso en su ánimo que el testimonio utilizado en el juicio público; que por no haber otros testigos de los incidentes ocurridos en la vista secreta, no se podía traer el testimonio de personas desinteresadas sobre lo sucedido en la cámara del juez; y que se le ofrecía al acusado la injusta alternativa de renunciar al contrainterrogatorio del juez—único testigo de lo ocurrido—o de contrainterrogarlo sabiendo que sería el mismo juez el llamado a dictaminar sobre la credibilidad de su testimonio." (págs. 279–280)

Luego de analizar lo resuelto en *In re Murchison* en la forma anteriormente expresada, procedimos en *In re Marín Báez* a distinguir dicho caso como sigue:

"Son claras y fundamentales las diferencias entre el procedimiento proscrito en *Murchison* y el que provee la sec. 24 de la Ley de la Judicatura. Se destaca inicialmente el hecho de que el primero es un procedimiento penal mientras que el segundo es civil, similar a uno de naturaleza administrativa, aunque *sui generis*. Esa diferencia, aunque importante por las mayores restricciones de constitución y de ley aplicables a los trámites que pueden privar a una persona de su libertad, no resulta decisiva. Así es porque la sec. 24 ordena conceder a las partes la 'oportunidad de ser oídas' en un procedimiento que según el informe legislativo es 'esencialmente un juicio', y es requisito indispensable de todo juicio el desinterés e imparcialidad del juzgador. Al traspasar, por ese motivo, las fronteras de la caracterización del procedimiento observamos que en el presente caso, contrario a lo sucedido en *Murchison*: (1) los jueces de este Tribunal no fueron en modo alguno testigos de los hechos ni estuvieron afectados personalmente por las actuaciones del querellado; (2) hubo numerosos testigos de tales hechos y el querellado tuvo completa oportunidad en una vista pública y con la debida asistencia de abogados de interrogarlos y de ofrecer aquellos testimonios que consideró favorecían su defensa; (3) la investigación inicial estuvo a cargo de ciertos funcionarios del Departamento de Justicia y los jueces de este Tribunal nunca se relacionaron con los testigos ni en manera alguna intervinieron en la investigación; (4) la querella la

prepararon y firmaron dichos funcionarios; y (5) ellos las sostuvieron ante el Tribunal utilizando las pruebas y estrategia que consideraron convenientes. El caso de *Murchison* es, por lo tanto, claramente inaplicable a una situación en la cual la participación de este Tribunal en la etapa inicial del procedimiento se reduce a ordenar una investigación de los hechos, a examinar el informe correspondiente y a ordenar la formulación de una querella, si considera que existe causa 'para ulteriores procedimientos'.

Y en el escolio 8 a la página 281, añadimos lo siguiente:

"Considérese, además, que dos fallos recientes del Tribunal Supremo federal han limitado considerablemente los efectos del lenguaje amplio usado en *Murchison,* reduciendo su autoridad a los hechos específicos en él planteados. Examínense *Nilva* v. *United States,* 352 U. S. 385 (1957) y *Green* v. *United States,* 356 U. S. 165 (1958) en los cuales los jueces disidentes (352 U. S. 396, 403; 356 U. S. 193, 199) en vano solicitaron la aplicación de *Murchison* a otras situaciones, aun cuando en éstas los jueces sentenciadores habían sido afectados directamente por las actuaciones de los acusados. Véanse, además, *Sacher* v. *United States,* 343 U. S. 1 (1952); 2 Davis, *Administrative Law Treatise* (1958), págs. 177–178; *Yates* v. *United States,* 355 U. S. 66 (1957); *Offutt* v. *United States,* 348 U. S. 11 (1954); *Pueblo* v. *Susoni,* ante pág. 124 (19 de marzo de 1959)."

No cabe dudar por lo tanto que la situación de hechos del caso ante nos es fundamentalmente distinta a la que fue considerada en *In re Murchison* y esencialmente similar a la de *In re Marín Báez.* Y en *In re Marín Báez,* según ya hemos visto, resolvimos que no se infringía la disposición constitucional sobre el debido proceso de ley. (4)

■ Este Tribunal estará siempre presto a resguardar

---

(4) Nada de lo aquí expuesto prejuzgará la consideración de un caso en que pueda efectivamente determinarse, como se dijo en *In re Marín Báez* y quedó demostrado en *In re Murchison* que "la índole del procedimiento, el grado de relación del juez con la prueba y los probables efectos de esa relación sobre su desinterés e imparcialidad" deban llevarnos a la conclusión de que el acusado no ha gozado del juicio justo a que tiene derecho al amparo del principio del debido proceso de ley.

los preceptos de la Carta de Derechos de nuestra Constitución contra todo embate de las fuerzas contrarias a la esencial libertad y dignidad del ser humano. En la lucha en que se hallan hoy enfrascadas las democracias frente a los desmanes del totalitarismo, la preservación de las garantías fundamentales de la libertad individual es responsabilidad insoslayable, inherente al ejercicio de la confianza pública depositada en nosotros. Si permitiéramos que esas libertades se fueran horadando paulatinamente, estaríamos sembrando la insidiosa semilla de nuestra propia destrucción. No es exagerado afirmar que en esa lucha le va la vida misma al sistema democrático. *Valentín* v. *Torres*, 80 D.P.R. 463 (1958).

Pero el resguardo que se merecen y que le debemos a esos pilares de la libertad, no justifican que demos libre curso a toda alegación basada en supuestas lesiones a los derechos civiles de un acusado. Es preciso que se demuestre que el derecho que se reclama ha sido en verdad vulnerado. Los hechos en el caso de autos no revelan lesión alguna.

■ ■ Réstanos considerar ahora dos cuestiones adicionales planteadas por la apelante. Se refieren a que el tribunal de instancia erró al no suspender la vista del caso y a que se cometió error al declarar sin lugar una moción sobre nulidad de orden de allanamiento y supresión de evidencia.

Teniendo presente lo que reiteradamente hemos resuelto al efecto de que la suspensión de un juicio descansa siempre en la sana discreción del tribunal, y que no intervendremos en tal discreción, a no ser que se demuestre que ha habido un abuso en el ejercicio de ella, *Pueblo* v. *Arce*, 67 D.P.R. 253, 264 (1947), *Pueblo* v. *Cordero*, 82 D.P.R. 379 (1961), consideremos las circunstancias del presente caso. La acusación fue radicada el 10 de marzo de 1955. El acto de la lectura de la acusación ocurrió el 24 siguiente. Se suspendió el caso en dos ocasiones a solicitud de la apelante. Es cinco meses después de la lectura de la acusación, al llamarse el

caso para la vista en su fondo y para la discusión de una Moción Sobre Nulidad de Allanamiento y Supresión de Evidencia, que, luego de discutirse dicha moción y declararse ésta sin lugar, se solicita la suspensión para, "decidir el curso a seguir en este asunto, si elevar un certiorari a virtud de la resolución de V.H. o prepararnos para entrar en la prueba." Estos hechos son elocuentes. De su exposición surge claramente que el tribunal de instancia no abusó de su discreción al negarse a suspender la vista del caso.

En apoyo de su contención de que la orden de allanamiento es nula la apelante sostiene que la declaración jurada(5) que sirvió de base para la expedición de la orden no contiene hechos constitutivos de causa probable. Una cuestión similar fue levantada por el apelante en el caso de *Pueblo* v. *Rivera*, 79 D.P.R. 742 (1956) y resolvimos que la declaración jurada envuelta en aquel proceso era suficiente. La declaración jurada que en este se impugna además de contener los hechos que consideramos en *Pueblo* v. *Rivera*, contiene hechos y circunstancias adicionales que tienden a establecer la existencia de causa probable. No se cometió el error señalado.

*Se confirmará la sentencia apelada.*

---

(5) "Que esto me consta porque en varias ocasiones distintas he visto a Jane Doe C/P "María", manipulando, contando, cotejando, chequeando y guardando en su casa descrita material de bolita y boli-pool como arriba lo he descrito, y dinero producto de colectas de bolita, siendo la última vez que lo vi el día 21 de febrero de 1955, que a eso de las 5:00 de la tarde, mientras me encontraba de recorrida por la Bda. Clausells de Ponce, P. R., al pasar frente a la casa residencia de la querellada, miré hacia el interior de la misma y vi varias personas sentadas alrededor de una mesa y estaban contando dinero. Que vi además que de una bolsa de papel sacaron boletos, tickets, talonarios de bolita en diferentes colores y con números de tres cifras impresos. Que una señora de las allí presentes y a quien no pude identificar dictaba números de tres cifras, los que eran apuntados y cotejados por otra persona. Que vi que sobre la mesa tenían varias listas conteniendo nombres de personas y números de tres cifras apuntados para el juego ilegal de bolita. Que una de las personas allí presentes notó mi presencia y cerró la puerta por lo que me fue imposible ocupar el referido material de bolita."

El Juez Asociado Sr. Serrano Geyls concurre con el resultado y la opinión, excepto que, a su juicio, no resulta en modo alguno decisivo que en el caso presente el juez a quo, al desempeñar su función investigadora, examinara unas declaraciones juradas en lugar de oir a los testigos. Considera que a ambas situaciones les son aplicables las mismas normas constitucionales, según éstas se explicaron en *In re Marín Báez*, 81 D.P.R. 274 (1959).