EL PUEBLO DE PUERTO RICO, apelado, *v.* OSCAR LÓPEZ GUZMÁN, acusado y apelante.

*Número:* CR-89-39 *Resuelto:* 28 de octubre de 1992

*José Juan Nazario de la Rosa* y *Juan Santiago Nieves*, de *Nazario & Santiago*, abogados del apelante; *Jorge E. Pérez Díaz, Procurador General, Norma Cotti Cruz, Subprocuradora General*, y *Ricardo E. Alegría Pons, Procurador General Auxiliar*, abogados de El Pueblo.

El Juez Asociado Señor Rebollo López emitió la opinión del Tribunal.

La justicia, tomada en su acepción más universal, según la definición de Ulpiano, "es la constante y permanente voluntad de dar a cada uno lo suyo". Fernández Sabaté, *Filosofía del Derecho*, Buenos Aires, Eds. Dipalma, págs. 303–304.

No obstante el loable y respetable esfuerzo realizado, a nivel apelativo, por la representación legal del apelante Oscar López Guzmán,[1] un examen detallado, minucioso y desapasionado de la transcripción de evidencia que fuera preparada en el presente caso,[2] nos convence que procede la confirmación de las sentencias que, por los delitos de asesinato en primer grado —dos (2) cargos— e infracción a los Arts. 6 y 8 de la Ley de Armas de Puerto Rico, le fueran impuestas a éste por el Tribunal Superior de Puerto Rico, Sala de Utuado.[3]

---

[1] El alegato que, en representación del apelante López Guzmán, radicaran los Lcdos. Juan Santiago Nieves y José Juan Nazario de la Rosa muy bien podría servir de ejemplo, para la profesión, del tipo de alegato que debe ser radicado ante un tribunal apelativo.

[2] Dicha transcripción de evidencia consta de seiscientos doce (612) folios.

[3] El apelante López Guzmán fue sentenciado a cumplir noventa y nueve (99) años de prisión en cada caso de asesinato en primer grado, a ser cumplidos concurrentemente entre sí pero consecutivamente con las sentencias en los casos de la Ley

Ello llana y sencillamente debido a que, a la luz de la prueba que desfilara ante el tribunal de instancia, *los veredictos de culpabilidad que rindió el Jurado que, como juzgador de los hechos, intervino en el proceso que se le celebró al apelante López Guzmán resultan no sólo ser procedentes en derecho sino que justos y merecidos.*

## I

Conforme surge del testimonio que ante el tribunal de instancia prestaran los trece (13) testigos presentados por el Ministerio Fiscal,[4] alrededor de las 6:00 p.m. del día 2 de agosto de 1988, la Sra. Nitza María Nieves terminó de hacer "una compra" en el Supermercado "Mr. Special", sito en el pueblo de Lares, adonde había ido acompañada del Sr. Reynaldo Alicea Guzmán. Luego de abandonar el referido supermercado, la señora Nieves regresó al mismo en forma precipitada; de hecho, ésta entró al referido establecimiento comercial corriendo y gritando. Inmediatamente después de ella, entra el señor Alicea Guzmán, también corriendo.[5] Detrás de ellos, entró al supermercado el apelante López Guzmán, revólver en mano y corriendo tras ellos.[6] No se escuchó ni se observó discusión alguna.[7]

Segundos después, las personas allí presentes escucharon varias detonaciones de arma de fuego.[8] El apelante López Guzmán es observado disparando el arma de fuego

---

de Armas de Puerto Rico; en los cuales fue sentenciado a un término de un (1) año de prisión por el Art. 6 y de cinco (5) años por la infracción al Art. 8 de la Ley de Armas de Puerto Rico, 25 L.P.R.A. secs. 416 y 418.

[4] *La defensa se limitó a presentar testigos de reputación.*

[5] Testimonio de la testigo Lawnly Vázquez Román, cajera del Supermercado "Mr. Special". Págs. 385 y 387 de la Transcripción de Evidencia.

[6] Testimonio del testigo Joseph Soto, "gondolero" del Supermercado "Mr. Special". Págs. 411 y 412 de la Transcripción de Evidencia.

[7] Testimonio del testigo Luis Ortiz Girau, "bagger" del Supermercado "Mr. Special". Pág. 446 de la Transcripción de Evidencia.

[8] Testigo Vázquez Román, pág. 393 de la Transcripción de Evidencia; Testigo Soto, pág. 413 de la Transcripción de Evidencia.

que llevaba en la mano.(⁹) López Guzmán se arrodilla en el piso del supermercado, agarra con una mano la cabeza del señor Alicea Guzmán, y le apunta con el revólver al cuello de éste; se escucha una detonación.(¹⁰)

El apelante López Guzmán sale del Supermercado "Mr. Special", revólver en mano, caminando en forma normal y corriente y completamente tranquilo.(¹¹) López Guzmán se monta en un vehículo tipo Jeep, marca Suzuki, color verde, y se aleja del Supermercado "Mr. Special".(¹²)

Minutos más tarde, el apelante López Guzmán llegó —en un vehículo tipo Jeep, marca Suzuki, color verde— al Cuartel de la Policía de Lares, entrando al mismo con un revólver en la mano.(¹³) El apelante no estaba nervioso,(¹⁴) ni alterado.(¹⁵) Este le entrega al comandante de la Estación de la Policía de Lares, Teniente Rafael Torres Serrano, un revólver y unas balas.(¹⁶) El apelante, sin que se le preguntara nada y en forma completamente espontánea y voluntaria, le expresa al Teniente Torres Serrano: "Esta presión me la tenía que quitar yo de encima."(¹⁷)

El teniente Torres Serrano, luego de recibir y atender una llamada donde se le informó lo ocurrido, abandona el cuartel, para dirigirse al Supermercado "Mr. Special", quedando a cargo de la custodia del apelante el policía Jaime

---

(⁹) Testimonio de la testigo Rosa Emilia Pérez, cliente del Supermercado "Mr. Special". Págs. 481 y 482 de la Transcripción de Evidencia.

(¹⁰) Testigo Pérez, págs. 485, 486 y 487 de la Transcripción de Evidencia.

(¹¹) Testigo Soto, págs. 414, 415 y 434 de la Transcripción de Evidencia; Testigo Ortiz Girau, pág. 448 de la Transcripción de Evidencia.

(¹²) Testigo Ortiz Girau, pág. 448 de la Transcripción de Evidencia.

(¹³) Testimonio del testigo policía Jaime Mont, págs. 318 y 319 de la Transcripción de Evidencia.

(¹⁴) Testigo policía Mont, pág. 330 de la Transcripción de Evidencia.

(¹⁵) Testimonio del testigo Teniente Rafael Torres Serrano, pág. 309 de la Transcripción de Evidencia.

(¹⁶) Testigo teniente Torres Serrano, págs. 273 y 274 de la Transcripción de Evidencia.

(¹⁷) Testigo teniente Torres Serrano, pág. 302 de la Transcripción de Evidencia.

Mont, quien le hace las advertencias de ley a éste, utilizando para ello una tarjeta donde las mismas están escritas.([18]) El policía Mont no interroga al apelante.([19]) Ello no obstante, López Guzmán voluntariamente le dice al policía Mont: "Yo lo tenía que hacer, esa mujer me había denunciado un montón de veces, me tenía alejado de mi hijo, ya me tenía cansado."([20]) Poco después, llega la hermana del apelante al Cuartel de la Policía, persona a quien se le permitió hablar con éste.([21]) El policía Mont escucha cuando la hermana del apelante le preguntó a éste: "Hijo, ¿qué hiciste?"; igualmente escucha cuando el apelante le contesta: "La maté y si nace la mato de nuevo."([22])

Procede que se señale, en adición, que conforme declarara el patólogo forense que efectuó las autopsias en los cadáveres de los occisos Nitza María Nieves y Reynaldo Alicea Guzmán, la primera recibió dos (2) heridas de bala, a saber: una detrás de la oreja derecha y la segunda en la región vertebral lumbar de la espalda.([23]) En lo que respecta al occiso Alicea Guzmán, éste recibió tres (3) heridas de bala, a saber: dos (2) de ellas en la parte izquierda posterior del cuello y la tercera en la región inguinal.([24])

Por otro lado, conforme declaró el químico forense, José A. Mercado Negrón, del Instituto de Ciencias Forenses, un análisis que él realizara en la ropa del occiso Alicea Guzmán demostró que por lo menos una de las dos (2) heridas de bala que mostraba el occiso en el cuello fue "un tiro de

---

([18]) Testigo policía Mont, págs. 326, 327, 328 y 329 de la Transcripción de Evidencia.

([19]) Testigo policía Mont, pág. 347 de la Transcripción de Evidencia.

([20]) Testigo policía Mont, pág. 347 de la Transcripción de Evidencia.

([21]) Testigo policía Mont, pág. 346 de la Transcripción de Evidencia.

([22]) Testigo policía Mont, págs. 349 y 350 de la Transcripción de Evidencia.

([23]) Testimonio del testigo Dr. Francisco Landrón Guardiola, pág. 137, 141 y 145 de la Trascripción de Evidencia.

([24]) Testigo doctor Landrón Guardiola, págs. 110, 113. 118, 120 y 121 de la Transcripción de Evidencia.

contacto", ésto es, un disparo hecho a menos de dos (2) pies de distancia del occiso.([25])

Por último, debe señalarse que el Ministerio Fiscal, a través del testimonio de varios testigos, demostró que el arma de fuego que el apelante López Guzmán voluntariamente le entregara al teniente Torres Serrano en el Cuartel de la Policía de Lares fue el arma que efectivamente disparó las balas o proyectiles que le causaron la muerte tanto a Nitza María Nieves como a Reynaldo Alicea Guzmán, proyectiles que fueron recuperados por el patólogo forense en los cadáveres de éstos.

## II

Inconforme con las sentencias que le fueron impuestas por el tribunal de instancia, Oscar López Guzmán le imputa en apelación a dicho foro haber incurrido en diez.(10) errores, los cuales, a su juicio, ameritan la revocación de las sentencias apeladas y la celebración de un nuevo juicio. Estos son:

A. Se violó el derecho del acusado a permanecer en silencio durante el juicio y a que su silencio no fuese comentado.

B. Se violó el derecho del acusado [a] una apelación efectiva de las causas criminales en su contra al no grabarse o transcribirse los informes finales, particularmente del ministerio público y socavar la oportunidad de que el foro apelativo pudiera evaluar, a base del récord, sus señalamientos de errores sobre comentario al silencio del acusado.

C. Se violó el derecho del acusado a la no autoincriminación al admitirse expresiones obtenidas luego de su arresto sin habérsele reconocido su derecho a asistencia de abogado.

CH. Se violó el derecho del acusado a asistencia de abogado, a la no autoincriminación y la prohibición contra registros y allanamientos irrazonables al admitirse expresiones confidenciales realizadas en expectativa de intimidad en una conversación con su hermana, luego de su arresto, mientras se encontraba en una celda del cuartel.

---

([25]) Testimonio del testigo José A. Mercado Negrón, págs. 227, 231, 238 y 239 de la Transcripción de Evidencia.

D. Se violó el derecho constitucional del acusado a un juicio justo al negarse el Honorable Tribunal de Instancia a dar instrucciones al jurado por el delito de homicidio.

E. Se violó el derecho constitucional del acusado a presentar testigos de defensa al denegarse su solicitud para presentar como testigo al Honorable Juez que entendió en la vista preliminar a los fines de impugnar el testimonio de un importante testigo de cargo cuyo testimonio contenía prueba exculpatoria en cuanto a los testigos instruídos, o en la alternativa, fortalecía la petición de la defensa sobre instrucciones al jurado por el delito de homicidio.

F. Se violó el derecho constitucional del acusado a una asistencia efectiva de abogado.

G. Se violó el derecho constitucional del acusado al debido proceso de ley y a un juicio justo e imparcial al ventilarse el juicio en su fondo ante un magistrado que había intervenido en el caso en procedimientos anteriores al juicio sobre, entre otros, la desestimación de las acusaciones al amparo de la Regla 64(p) de Procedimiento Criminal.

H. Se violó el derecho constitucional del acusado a un juicio justo e imparcial considerados en conjunto la totalidad de los errores de derecho cometidos en el caso de epígrafe.

I. Erró manifiestamente el jurado, como cuestión de derecho al no conceder al acusado el beneficio de la duda razonable vista la totalidad de la prueba en cuanto a los delitos que fueron instruídos. Alegato del apelante, págs. 12–13.

## III

■ De no haber tenido el apelante López Guzmán, como se alega en el séptimo señalamiento de error, "una efectiva asistencia de abogado", no habría necesidad alguna de discutir los otros nueve (9) señalamientos de error; ello por razón que de asistirle la razón en dicho planteamiento, procedería sin duda la revocación de las sentencias apeladas y la celebración de un nuevo juicio. Abordamos y discutimos, en consecuencia, el referido señalamiento en primer término.

■ Dispone la Sec. 11 del Art. II de la Constitución del Estado Libre Asociado de Puerto Rico, en lo pertinente, que en "todos los procesos criminales, el acusado disfrutará del derecho ... a tener asistencia de abogado ...". L.P.R.A.,

Tomo 1, ed. 1982, págs. 307–308. Ello, naturalmente, significa *algo más* que el *mero* hecho de contar con la asistencia de un abogado. Constituye principio jurisprudencial indiscutible que lo que la referida disposición constitucional le garantiza a todo imputado de delito es una *adecuada y efectiva* asistencia de abogado.

En apoyo del referido señalamiento de error, la representación legal del apelante, a nivel apelativo, enumera diez (10) actuaciones u omisiones, de parte de los abogados que representaron al apelante a nivel de instancia, que a su juicio constituyen evidencia fehaciente de que el apelante careció de una adecuada y efectiva representación legal durante el proceso criminal que se le celebrara a saber:

1. No se presentó una moción al amparo de la Regla 95 de Procedimiento Criminal que permitiese un descubrimiento de prueba adecuado en preparación de una defensa adecuada; Expediente del caso —Legajo en Apelación; T.E. págs. 295–296.
El descubrimiento de prueba en poder del ministerio público es un elemento indispensable de una defensa adecuada del acusado, no tan sólo para conocer la prueba de cargo sino para obtener cualquier evidencia que pudiese beneficiar al acusado o que pudiese conducir a otra evidencia en su beneficio. Es deber ineludible del abogado defensor descubrir la prueba en poder del fiscal mediante el uso oportuno de[l] mecanismo provisto por la Regla 95 de Procedimiento Civil. *Pueblo v. Morales Suárez*, 117 D.P.R. 497 (1986).
2. No se entrevistaron testigos de defensa previo al día del juicio en su fondo e incluso para este día se desconoc[í]a cuáles habría de presentar, anunciándose un sinnúmero de posibles testigos que no habían sido entrevistados ni localizados; Transcripción, pág. 40 y ss. Exhibits 1, 2, 3 y 4.
3. Presentación de una Petición de Certiorari que no cumplió con los requisitos reglamentarios y fue denegada por este fundamento; *Pueblo v. López Guzmán*, CE-89-133, *Resolución* de 6 de marzo de 1989.
4. No objetaron la admisibilidad de expresiones incriminatorias obtenidas del acusado en violación de su derecho [a] asistencia de abogado; T.E. págs. 302, 347. No se solicitó la supresión de esta evidencia previo al acto del juicio ni durante el juicio, como tampoco se solicitó una determinación previa sobre la admisibilidad de esta evidencia. Regla 9 de Evidencia. Más aún, insó-

litamente, los abogados de defensa promovieron la introducción de esta evidencia incriminatoria.

5. No objetaron la admisibilidad de expresiones vertidas en una conversación privada entre el acusado y su hermana, con expectativa de intimidad, verificadas después de encontrarse bajo arresto y en la celda del cuartel. T.E. págs. 349–350. No se solicitó la supresión de esta evidencia previo al acto del juicio ni durante el juicio, como tampoco se solicitó una determinación previa sobre la admisibilidad de esta evidencia. Regla 9 de Evidencia.

6. No objetaron la admisibilidad de prueba inflamatoria e innecesaria que se encontraría en poder del jurado al momento de deliberar. T.E. págs. 357–361.

7. No solicitaron la transcripción de los informes al jurado al comienzo de éstos, como tampoco luego de haber objetado, en varias ocasiones, expresiones del ministerio público dirigidas a macular el procedimiento comentando el silencio del acusado; T.E. págs. 557–561.

8. No grabaron los procedimientos para salvaguardar los derechos del acusado en apelación, conforme lo autoriza y permite la ley. Regla 13 (a) de [la] Administración de los Tribunales de Primera Instancia.

9. No presentaron prueba de defensa adicional sobre la relación previa del acusado con la occisa y otra que hubiese podido descubrirse con una investigación adecuada de los hechos sobre la cadena de incidentes acontecidos previamente dirigidos a demostrar súbita pendencia y arrebato de cólera en fortalecimiento de la prueba en el récord que acreditaba instrucciones al jurado por el delito de homicidio voluntario.

10. No utilizaron el beneficio del récord adecuadamente, diluyendo planteamientos de derecho y objeciones que se vertieron y discutieron en la oficina del Juez de Instancia y que luego mencionan para récord sin elucidación completa y apropiada. En particular, se destacan el debate sobre solicitud de instrucción al jurado por el delito de homicidio, la petición de disolución del jurado por comentarios al silencio del acusado y otras. Llega al extremo esta práctica que la solicitud de presentación de testigo de defensa —juez que entendió en la vista preliminar— para impugnar el testimonio de un testigo de cargo y aclarar su versión inicial sobre una pelea al momento de los hechos en el supermercado, no es parte de la transcripción de la evidencia, aunque en efecto se debió producir en cámara. Alegato del apelante, págs. 65–67.

■■■ *No* le asiste la razón. En fecha relativamente reciente, este Tribunal tuvo la oportunidad de expresarse al

respecto. En *Pueblo v. Morales Suárez*, 117 D.P.R. 497, 501-503 (1986), establecimos, en síntesis, que:

(1) existe "una fuerte presunción de que la conducta del defensor está comprendida dentro del amplio ámbito de una razonable asistencia legal;
(2) recae sobre el apelante el peso de la prueba de su indefensión por incompetencia del abogado;
(3) la incompetencia enervante de la asistencia legal a que tiene derecho el acusado ha de ser de grado extremo, causante de perjuicio sustancial, al punto que sostenga la probabilidad de que de no haber incidido, el resultado del juicio hubiera sido distinto, y
(4) el "criterio final para adjudicar una reclamación de falta de efectividad en la defensa debe ser si la actuación del abogado de tal modo vulneró el adecuado funcionamiento del sistema adversativo que no pueda decirse que el juicio tuvo un resultado justo".

■ Añadimos, y aclaramos, hoy algo que está inmerso en la decisión que emitiéramos en *Pueblo v. Morales Suárez*, ante; esto es, que el planteamiento sobre falta de adecuada y efectiva asistencia de abogado *no* se puede analizar y resolver en el vacío. Dicho señalamiento tiene que, *necesariamente*, considerarse a la luz de la totalidad de los hechos, o circunstancias, del caso particular en ese momento ante la consideración del tribunal apelativo. *Baldwin v. Maggio*, 704 F.2d 1325 (1983).

El presente caso, posiblemente, sea uno de los mejores ejemplos de lo anteriormente expresado. En primer lugar, y por los fundamentos que expondremos más adelante, muchas de las actuaciones que se le imputan a los abogados que representaron al apelante a nivel de instancia, como indicativas de falta de competencia profesional de su parte, *realmente no constituyen acciones u omisiones erróneas de parte de éstos.*[26] En segundo término, e indepen-

---

[26] Mediante las instancias cuarta y quinta se le imputa incompetencia a los referidos abogados por haber éstos introducido y/o no haber objetado la admisibilidad de unas expresiones hechas por el apelante mientras se encontraba en el Cuartel de la Policía de Lares. Dichas manifestaciones eran, por los fundamentos que más ade-

dientemente del hecho que los referidos abogados efectivamente incurrieran en varios errores de acción u omisión, *no* creemos que el resultado del caso hubiera sido distinto de no haberse cometido dichos errores y, ciertamente, tampoco se puede decir que dicho resultado no fue uno justo. *Pueblo v. Morales Suárez*, ante. Ello nos lleva, por último, a una dura pero inescapable realidad: no podemos sustraernos del hecho incuestionable que el caso, *dado sus hechos particulares*, era uno *sumamente difícil* para la defensa. El mismo, en nuestra opinión, hubiera constituido un "hueso duro de roer" para, *inclusive*, el más ducho y capaz de los abogados criminalistas del País.

En resumen, el hecho de que el resultado del proceso que se le celebrara al apelante a nivel de instancia fuera adverso a éste, *no* significa que el referido acusado hubiera carecido de adecuada asistencia de abogado. Dicha asistencia, no hay duda, pudo haber sido de una calidad superior. La misma, sin embargo, *no* justifica que revoquemos las convicciones apeladas y decretemos la celebración de un nuevo juicio.

## IV

Mediante los señalamientos tercero y cuarto, el apelante alega violación a sus derechos contra la autoincrimi-

---

lante expondremos, admisibles en evidencia.

La instancia tercera —relativa a la presentación de un recurso de *certiorari* ante este Tribunal— realmente no tiene relación de causa y efecto alguna con el resultado del juicio.

La novena instancia —no haber presentado prueba sobre la relación previa entre el acusado y la occisa— es verdaderamente discutible y controversial como estrategia forense ya que la presentación de la evidencia a la que la misma se refiere podía constituir, dados los hechos particulares del caso, un "cuchillo de dos filos". La misma, a lo sumo, puede considerarse como un error de juicio de los abogados.

La omisión de no solicitar que se grabaran los informes del Jurado y la no utilización, durante el juicio, de equipo de grabación —instancias séptima y octava— no constituyen errores graves demostrativos de incompetencia profesional.

Las instancias sexta y décima son especulativas y/o no se fundamentan adecuadamente.

nación, asistencia de abogado y contra "registros y allanamientos" y su derecho a la privacidad en relación con la admisión en evidencia de unas manifestaciones que él hiciera el día de los hechos, en distintos momentos, en el Cuartel de la Policía de Lares; manifestaciones, *tipo admisiones*, sobre las cuales testificaron el teniente de la policía Torres Serrano y el policía Jaime Mont. Nos señala que el error, alegadamente cometido por el foro de instancia en este respecto, es de tal magnitud que el mismo amerita, per se, la revocación de las sentencias apeladas. Ello, por razón de que "de ordinario, la prueba más incriminatoria, perjudicial y devastadora con que puede contar el Ministerio Fiscal contra un imputado de delito lo es la de que éste admitió la comisión del delito que se le imputa ...". (Énfasis en el original suprimido.) *Pueblo v. Robles González*, 125 D.P.R. 750, 758–759 (1990). *No tiene razón; veamos por qué.*

De entrada debemos dejar establecido que, dados los hechos particulares del caso ante nuestra consideración, nos enfrentamos a unas manifestaciones o admisiones, hechas por un acusado durante la etapa prejudicial o investigativa del caso, que no presentan problema o violación alguna al derecho de confrontación y que, en consecuencia, son admisibles en nuestra jurisdicción bajo las disposiciones de la Regla 62(A) de Evidencia, 32 L.P.R.A. Ap. IV, *siempre y cuando* no se haya incurrido, como alega el apelante, en violación a los antes mencionados derechos constitucionales.

Constituye doctrina jurisprudencial firmemente establecida, tanto en la jurisdicción federal como en la nuestra, que cuando una investigación criminal que está siendo realizada por agentes del orden público *se centra* sobre una persona en particular, y dicho ciudadano está bajo custodia, si es que dichos agentes pretenden interrogar al sospechoso, éstos vienen en la obligación de advertirle a esta persona de una serie de derechos constitucio-

nales que nuestro ordenamiento le garantiza. Entre otros derechos, y en lo pertinente al caso ante nuestra consideración, el sospechoso debe ser advertido de su derecho contra la autoincriminación, esto es, que cualquier manifestación que él haga podrá luego ser utilizada en su contra durante el juicio que se le celebre, y sobre su derecho a estar asistido de un abogado, ya sea éste de su selección en caso de que pueda pagar los servicios del mismo, o de un abogado provisto, en forma gratuita, por el Estado. Véanse, entre otros: *Escobedo v. Illinois*, 378 U.S. 478 (1964); *Miranda v. Arizona*, 384 U.S. 436 (1966); *Rivera Escuté v. Jefe Penitenciaría*, 92 D.P.R. 765 (1965); *Pueblo v. Falú Martínez*, 116 D.P.R. 828 (1986); *Pueblo v. Ruiz Bosch*, 127 D.P.R. 762 (1991).

Ahora bien, de una lectura cuidadosa y comprensiva de las citadas decisiones —y su progenie— se desprende con meridiana claridad que para que esta norma jurisprudencial entre en vigor, esto es, para que un acusado pueda invocar con éxito la protección constitucional, y así impedir que el Estado presente en evidencia durante el proceso una admisión o confesión que él hizo durante la etapa investigativa por razón de habérsele violado su derecho contra la autoincriminación o su derecho a asistencia de abogado, *tienen que estar presentes cuatro (4) requisitos o circunstancias, a saber*:

(1) al momento de obtenerse la declaración impugnada —admisión o confesión— ya la investigación se había centralizado sobre la persona que prestó la misma, esto es, ya esa persona era sospechoso de la comisión de un delito;
(2) el acusado al hacer la declaración se encontraba "bajo custodia" del Estado;
(3) la declaración fue "producto de un interrogatorio" de parte de los agentes del Estado, y
(4) antes de que se comenzara el interrogatorio, o que se hiciera la manifestación objetada, los agentes *no* le hicieron advertencia alguna al sospechoso sobre los derechos que le asisten por lo que no medió renuncia alguna a dichos derechos de parte de éste.

Un examen de la transcripción de evidencia demuestra que en cuanto a la primera manifestación objetada —esto es, aquella que hace el acusado al teniente Torres Serrano y al policía Mont inmediatamente que llega al Cuartel de la Policía de Lares a los efectos de que "esta presión me la tenía que quitar yo de encima"— *no se cumple con los primeros tres (3) de los requisitos antes mencionados.* Ello así por cuanto, en primer lugar, al llegar López Guzmán al cuartel, los agentes del orden público ni tan siquiera tenían conocimiento de los hechos delictivos cometidos por éste minutos antes, razón por la cual éste no podía ser considerado "sospechoso" de crimen alguno en ese momento. En segundo lugar, el apelante, al momento de hacer dicha manifestación, no estaba bajo custodia alguna y, por último, éste no estaba siendo interrogado por agente alguno del Estado.

Con relación a la segunda de las manifestaciones objetadas —aquella que le hace el apelante al policía Mont a los efectos de que "yo lo tenía que hacer, esa mujer me había denunciado un montón de veces, me tenía alejado de mi hijo, ya me tenía cansado"— no hay duda que, aún cuando se cumplen con los primeros dos (2) de los requisitos, el tercero de ellos está completamente ausente. El apelante López Guzmán, al hacer dicha manifestación, ciertamente era ya sospechoso de la comisión de los hechos acaecidos en el Supermercado "Mr. Special", hechos de los cuales la Policía ya había sido apercibida. Prueba indiscutible de ello lo constituye el hecho de que el policía Mont había entendido procedente hacerle a éste las "advertencias de ley". Por otro lado, al hacer dicha manifestación López Guzmán sin lugar a dudas se encontraba "bajo custodia". Ciertamente él se encontraba en el cuartel privado de libertad de movimiento; a todos los fines prácticos, estaba bajo arresto. Véase *New York v. Quarles*, 467 U.S. 649 (1984). Ahora bien, la referida manifestación *no* fue el producto de un "interrogatorio" de parte de agentes del

Estado. En otras palabras, previo a que el apelante hiciera dicha manifestación, los agentes del Estado no habían incurrido en conducta alguna —contentiva de preguntas o conversación— con el propósito de que el apelante hiciera manifestaciones incriminatorias. Véase *Rhode Island v. Innis*, 446 U.S. 291 (1980).[27]

Igual razonamiento se aplica, prima facie, a la tercera manifestación impugnada, esto es, aquella que hace el apelante a preguntas de su hermana, a los efectos de que "la maté y si nace la mato de nuevo", y sobre la cual declaró en el juicio el policía Mont. Ello así por cuanto si bien el apelante, al hacerlo, era ya un sospechoso e, igualmente, se encontraba en ese momento bajo custodia policiaca, la misma no fue producto de interrogatorio alguno de parte de agentes del Estado.

Esta tercera situación, sin embargo, contiene una variación o complicación no presente en las otras dos (2) situaciones anteriores. Se sostiene por el apelante, a nivel apelativo, que dicha manifestación no es admisible en evidencia por el fundamento adicional de que la misma viola su derecho contra registros y allanamientos irrazonables y su derecho a la privacidad por cuanto dicha manifestación fue "obtenida" por el policía Mont en forma subrepticia al ilegalmente escuchar una conversación entre él y su hermana. *Tampoco le asiste la razón en este planteamiento.*

▮▮▮▮ Aun cuando es enteramente correcto que el hecho de que un ciudadano esté arrestado o internado en una institución penal no significa que éste se encuentre totalmente desprovisto de protección contra ataques a su intimidad, *Pueblo v. Falú Martínez*, supra, y que el Tribunal Supremo de los Estados Unidos ha resuelto que procede la

---

[27] Por otro lado, y aún en el supuesto de que se entendiera que se cumple con los tres (3) primeros requisitos, es de notar que el policía Mont le hizo las "advertencias de ley" al apelante; razón por la cual la manifestación objetada sería admisible en evidencia por haber mediado renuncia de parte del apelante a dichos derechos.

supresión de evidencia, consistente de manifestaciones, obtenidas por el Estado *de modo subrepticio o doloso* mientras el acusado se encuentra bajo custodia —*United States v. Henry*, 447 U.S. 264 (1980); *Brewer v. Williams*, 430 U.S. 387 (1977); *Massiah v. United States*, 377 U.S. 201 (1964)— un examen de la transcripción de evidencia revela que ésta no contiene prueba alguna de la cual tan siquiera se pueda inferir que el policía Mont hubiera incurrido en conducta dolosa o subrepticia, o que hubiera llevado a cabo maquinaciones, con el propósito de escuchar la conversación ocurrida entre el apelante y su hermana en violación de los derechos del apelante. *Por el contrario, la prueba lo que demuestra es que el apelante hizo dichas manifestaciones a manera de desahogo, consciente de que podía ser escuchado por cualquier persona que se encontrara en las cercanías del sitio donde se encontraba detenido, razón por la cual no puede ahora reclamar violación alguna de su derecho de intimidad.* Resultan enteramente aplicables a esta situación, las expresiones de este Tribunal, en *Pueblo v. Rodríguez Martínez*, 100 D.P.R. 805, 812 (1972), a los efectos de que:

> Los que redactaron las constituciones de Puerto Rico y de los Estados Unidos, ciertamente tuvieron en mente prohibir que *nadie fuese obligado* a incriminarse mediante su propio testimonio, *pero no se propusieron prohibir que un delincuente confesase libre y voluntariamente su crimen haciendo así las paces con su conciencia y con la sociedad.* Esas dos constituciones tienen como uno de sus objetivos proteger la libertad de la conciencia de los seres humanos, no encadenarlas al mal. Dichas constituciones no exigen que una persona que ha llegado a ser delincuente está además obligada a ser mentiroso o perjuro toda su vida. Lo ético es decir la verdad aunque eso resulte amargo. La constitución no está reñida con la ética. (Énfasis suplido y en el original.)

## V

Sostiene el apelante, mediante su quinto señalamiento de error, que procede la revocación de las sentencias ape-

ladas, y la celebración de un nuevo juicio, por razón de que el tribunal de instancia, viniendo alegadamente obligado a ello por la prueba desfilada, no instruyó al Jurado sobre el delito menor incluido de homicidio voluntario. En apoyo de dicho señalamiento se alega que, conforme el testimonio de los testigos presentados por el Estado, en el Supermercado "Mr. Special" el día de los hechos "hubo una riña que culminó en el incidente trágico"; "ocurrió un altercado entre el acusado y las víctimas"; y "que se oyeron unas griterías, un 'revolú' y una pelea por un espacio de tiempo". Se señala, en adición, que el significado corriente y usual del término "revolú" lo es "motín, revuelta, pelotera, escándalo" y el de "pelotera" lo es, a su vez, "riña o contienda". *No tiene razón.*

■■■■ Al respecto, y en lo pertinente, expresamos en *Pueblo v. Cruz Correa,* 121 D.P.R. 270, 276–278 (1988), que:

> No debe perderse de vista que el derecho constitucional a juicio por jurado que tiene en nuestra jurisdicción toda persona que es acusada de la supuesta comisión de delito grave —e inclusive, en ciertas circunstancias, de delito menos grave— necesariamente implica y conlleva que ese jurado será el que actúe en el proceso como "juzgador de los hechos". Ello significa que será ese jurado el que tenga la "última palabra" no sólo en cuanto a la culpabilidad o inocencia del imputado del delito sino que será el que determine —en caso de entender que el acusado incurrió en responsabilidad en relación con los hechos que se le imputan— el delito en específico, o el grado del mismo, por el cual éste debe responderle a la sociedad.
>
> Ello, naturalmente, requiere que el jurado sea correctamente instruido por el juez que preside el proceso. Debido a todo lo anteriormente expresado es que nuestro ordenamiento tiene como principio rector —según lo expresáramos en *Pueblo v. González Colón,* 110 D.P.R. 812, 815 (1981)— que "las instrucciones al jurado deben cubrir, *si la prueba lo justifica,* no sólo los elementos de delitos inferiores al delito imputado o comprendido dentro de éste, sino también los elementos esenciales de las defensas levantadas por el acusado, así como los puntos de derecho que bajo cualquier teoría razonable puedan estar presentes en las deliberaciones, *aunque la prueba de defensa sea débil, inconsistente o de dudosa credibilidad".* (Énfasis suplido.)

Sobre la procedencia, en específico, de una instrucción sobre el delito de homicidio voluntario en un proceso seguido contra un acusado por el delito de asesinato, resolvimos en *Pueblo v. Galarza*, 71 D.P.R. 557, 561 (1950), que:

"No es necesario que la prueba de homicidio resulte incontrovertida o concluyente sobre la cuestión; mientras haya algún indicio de prueba a ese efecto, el jurado es el llamado a aquilatar la misma. De haber alguna evidencia tendiente a demostrar un estado de hechos que haga caer el caso dentro de la definición de homicidio voluntario, es al jurado que incumbe determinar si tal prueba es cierta o no, y si la misma demuestra que el delito cometido fue homicidio voluntario y no asesinato." (Traducción nuestra.) *Stevenson v. United States*, 162 U.S. 313, 314 (1895).

En otras palabras —y sobre ello no debe existir duda alguna— no importa cuan abrumadora pueda parecerle al juez que preside el proceso la prueba de asesinato, mientras haya *alguna prueba* que tienda a indicar la posibilidad de un homicidio, ese juez viene obligado a transmitirle al jurado las instrucciones pertinentes sobre el referido delito y es al jurado a quien le corresponde aquilatar dicha prueba y determinar el delito por el cual debe responder el acusado. *Pueblo v. Galarza*, ante; *Pueblo v. González Colón*, ante.([28])

Un examen *minucioso* de la transcripción de evidencia nos convence de que en el presente caso *no* se cometió el error imputado por razón de que *no* hay prueba alguna en dicho récord "que tienda a indicar la posibilidad de un homicidio ...". *Pueblo v. Cruz Correa*, ante, pág. 278. *No* es correcta la alegación a los efectos de que los testigos de cargo declararan que las muertes ocurridas en el mencionado Supermercado *fueron precedidas* por la ocurrencia de una riña, altercado, pelea o discusión entre el apelante y las dos (2) personas que allí resultaron muertas. Los testigos sí hablan de un "revolú" y unas "griterías"; *el "revolú y gritería" que es normal que ocurra cuando una persona, como en el presente caso, entra a un establecimiento público, lleno de parroquianos, y ultima a balazos a dos (2)*

([28]) Veánse, en adición: *Pueblo v. Bonilla Ortiz*, 123 D.P.R. 434 (1989); *Pueblo v. Torres Rodríguez*, 119 D.P.R. 730 (1987).

*seres humanos completamente indefensos en presencia de las demás personas allí presentes.*

## VI

En su octavo señalamiento de error, sostiene el apelante que se "violó [su] derecho constitucional al debido proceso de ley y a un juicio justo e imparcial al ventilarse el juicio en su fondo ante un magistrado que había intervenido en el caso en procedimientos anteriores al juicio sobre, entre otros, la desestimación de las acusaciones al amparo de la Regla 64(p) de Procedimiento Criminal". Alegato del apelante, pág. 68.[29] El planteamiento —aún cuando, dados los hechos particulares del caso, resulta inmeritorio— amerita consideración; ello debido, principalmente, a que nuestras expresiones al respecto, a través de los años, han sido un tanto ambivalentes.

El primer caso, de importancia con relación al *tema* ahora ante nuestra consideración, lo fue el de *In re Marín Báez,* 81 D.P.R. 274 (1959). Se trataba, en síntesis, de la dilucidación de una querella que, por orden de este Tribunal, radicara contra un Juez de Paz el Secretario de Justicia; orden que emitiéramos al amparo de la Sec. 24 de la Ley de la Judicatura, 4 L.P.R.A. sec. 232, luego de examinar un informe que se nos sometiera sobre una alegada conducta inmoral incurrida por dicho juez. El querellado impugnó la constitucionalidad de la mencionada disposición legal "toda vez que habiendo este mismo Tribunal determinado la existencia de causa para la radicación de la querella está impedido de resolver el caso en los méritos ya que de hacerlo estaría privando al querellado del debido procedimiento de ley". *In re Marín Báez,* ante, pág. 279. Al

---

[29] En adición, la representación legal del apelante plantea que el juez sentenciador, con anterioridad a la celebración del proceso criminal, había participado en un pleito civil sobre alimentos y relaciones paterno-filiares relativos al hijo producto de las relaciones del apelante López Guzmán con la occisa Nitza María Nieves.

rechazar la aplicación automática de la decisión emitida por el Tribunal Supremo de los Estados Unidos en el caso de *In re Murchison*, 349 U.S. 133 (1955),[30] al caso entonces ante nuestra consideración, y sostener la validez y corrección del procedimiento en controversia, expresamos, en lo pertinente, que:

En resumen, *nunca* ha sido *ni* es la norma constitucional que *cualquier contacto* previo con la prueba, no importa su alcance y efectos, incapacite a un juzgador para dirimir posteriormente los méritos de una controversia. En cada situación en que se alegue ese defecto constitucional *hay que considerar la índole del procedimiento, el grado de relación del juez con la prueba y los probables efectos de esa relación sobre su desinterés e imparcialidad y calibrar esos factores a la luz de la entereza moral y la disciplina profesional que necesariamente debe tener cualquier juez que merezca ese nombre.* Hasta el presente, sólo en *situaciones extremas* como la de *In re Murchison* es que por tal defecto se ha decretado la invalidez de una causa. (Énfasis suplido.) *In re Marín Báez*, ante, pág. 287.

---

[30] Conforme surge de la decisión emitida en *In re Marín Báez*, 81 D.P.R. 274, 279–280 (1959), en *In re Murchison*:

"... se impugnó por segunda vez ante el Tribunal Supremo federal la constitucionalidad del sistema del estado de Michigan que autoriza a sus jueces a compeler la presencia de testigos para prestar testimonio en investigaciones criminales secretas. Murchison y White, los apelantes en el caso, comparecieron ante uno de esos jueces a deponer sobre actividades de juego y de soborno oficial. Las contestaciones de Murchison convencieron al juez de que estaba cometiendo perjurio. Lo acusó por esa actuación y le ordenó comparecer ante él para mostrar causa por la cual no debería castigársele por desacato criminal. White se negó a contestar algunas de las preguntas que le hizo el juez, aduciendo que tenía derecho a asistencia de abogado antes de hacerlo. El juez lo acusó de desacato y le ordenó comparecer posteriormente. Luego el mismo juez les celebró un juicio público y les impuso una pena por desacato. El Tribunal Supremo de Michigan confirmó la sentencia y los acusados apelaron al Tribunal Supremo federal invocando, entre otras defensas, la garantía del debido procedimiento de ley. Dicho Tribunal, con la inconformidad de tres de sus jueces, aceptó el planteamiento de los apelantes y anuló la sentencia.

Consideró el Tribunal Supremo que en las circunstancias descritas un juez no podía tener completo desinterés en la culpabilidad o inocencia de un acusado; que como cuestión práctica lo más probable sería que las impresiones adquiridas por el juez durante la vista secreta tuviesen más peso en su ánimo que el testimonio utilizado en el juicio público; que por no haber otros testigos de los incidentes ocurridos en la vista secreta, no se podía traer el testimonio de personas desinteresadas sobre lo sucedido en la cámara del juez; y que se le ofrecía al acusado la injusta alternativa de renunciar al contrainterrogatorio del juez —único testigo de lo ocurrido— o de contrainterrogarlo sabiendo que sería el mismo juez el llamado a dictaminar sobre la credibilidad de su testimonio. (Escolios omitidos.)

El caso de *Marín Báez*, ante, sirvió de base para dos (2) decisiones, relativas al *punto específico* hoy bajo examen, que emitiera el Tribunal dos (2) años más tarde, a saber: *Pueblo v. Quiles*, 83 D.P.R. 63 (1961), y *Pueblo v. Pacheco*, 83 D.P.R. 285 (1961). En *Quiles*, ante, se impugnó la actuación del juez, como juzgador de los hechos en la vista en su fondo del caso, por razón de que éste había *examinado una declaración jurada*, luego de la cual determinó causa probable para la expedición de una orden de allanamiento. Al sostener la posición de que ello no impedía que dicho magistrado presidiera el proceso, y citando con aprobación lo expresado en *In re Marín Báez*, ante, manifestamos entonces:

> Como no examinó testigo alguno, no hubo posibilidad de que en su mente quedara grabado nada de lo que pueda impresionar a un juez cuando oye y ve declarar a una persona. Su intervención preliminar en el procedimiento se concretó a la actuación esencialmente pasiva del juzgador que, en forma enteramente impersonal, examina unos documentos a los fines de determinar si los mismos son de suficiente peso para justificar que se decrete el arresto. No fue la suya la conducta activa y llena de celo del acusador que investido de la función de traer al delincuente ante el foro de la justicia, se da de lleno, con la fogosidad y dinamismo que su ministerio público exigen, a la tarea de reunir la evidencia necesaria para sostener la acusación que ha de radicar. *Pueblo v. Quiles*, ante, pág. 66.

En *Pacheco*, ante, por el contrario, el juez examinó *personalmente a los testigos* antes de determinar causa probable para la expedición de la orden de allanamiento que se le solicitara. Apoyándonos, nuevamente, en *In re Marín Báez*, ante, rechazamos la contención de que dicho magistrado quedaba automáticamente descualificado para presidir, posteriormente, la vista en su fondo del caso. Es de notar que en esta ocasión al así resolver, expresamos que "[s]e ha establecido que a menos que se *demuestre específicamente prejuicio y parcialidad* de parte de un juez que preside una vista, el hecho de que ese mismo juez haya participado en procedimientos anteriores relacionados con

el caso, no lo descualifica para actuar en la vista principal". (Énfasis suplido.) *Pueblo v. Pacheco*, ante, pág. 290.

Ello no obstante, un (1) año más tarde este Tribunal resolvió que se infringe el debido procedimiento de ley cuando el juez que preside la vista en su fondo de un caso criminal es el mismo magistrado que "investigó" personalmente el caso, *al examinar los testigos*, y que determinó causa probable para el arresto del acusado, ordenando la radicación de las denuncias correspondientes. *Pueblo v. Toro Goyco*, 84 D.P.R. 492 (1962). Al "distinguir" la referida decisión de las emitidas en los casos de *Quiles* y *Pacheco*, ante, expresamos en *Toro Goyco*, ante, pág. 496:

> Aquí estamos ante un caso en que el juez que presidió la vista y condenó al acusado examinó los testigos y determinó según lo establece el art. 24 del Código de Enjuiciamiento Criminal, que se había cometido un delito. Existe la posibilidad de que en su mente quedaran grabadas las impresiones que pudieran influir en la apreciación que hizo de la prueba el día que se ventiló el caso. Su intervención fue más activa, pues la hizo con miras a reunir la evidencia necesaria para sostener la conclusión a que llegó de que el acusado era culpable.
>
> En esta situación parece clara la aplicabilidad de *In re Murchison*, supra, donde se estableció que se viola el debido proceso de ley cuando se celebra el juicio en su fondo ante el mismo juzgador que previamente tomó parte activa en la investigación de los hechos del caso. (Énfasis en el original.)

Unos años más tarde —al rechazar la alegación de que el juez que presidió el juicio por jurado que se le celebrara al allí apelante debió de haberse inhibido de hacerlo por haber tenido contacto previo con la prueba de cargo, consistente el mismo en haber tenido ante sí la declaración jurada de la principal testigo de cargo— en *Pueblo v. Dones Arroyo*, 106 D.P.R. 303, 317 (1977), este Tribunal expresó:

> El mero contacto previo con la prueba no incapacita al juez para ver el caso en los méritos. El acusado tiene que demostrar afirmativa y específicamente en qué consiste el prejuicio y parcialidad para que prospere una moción bajo la Regla 76 (f). Alegaciones y conjeturas no son suficientes. *Pueblo v. Pacheco*, ·

83 D.P.R. 285, 288–291 (1961). *Aun tiene menor importancia este contacto previo con la prueba cuando el caso, como lo fue el de autos, se ve ante jurado.* (Énfasis suplido.) *Pueblo v. Dones Arroyo*, ante, pág. 317.

Con relación al *tema* que ocupa nuestra atención, resulta relevante y pertinente mencionar la decisión que emitiéramos en *Martínez Torres v. Amaro Pérez*, 116 D.P.R. 717 (1985), aún cuando la misma no versa exactamente sobre el punto específico hoy en controversia. Allí resolvimos que cuando el Estado interesa obtener una revocación sumaria de los beneficios de una sentencia suspendida que esté disfrutando un convicto de delito grave, éste es acreedor a una "vista sumaria inicial" donde un juez evaluará si existe causa probable para creer que ha violado las condiciones de su probatoria, decisión definitiva que tendrá que hacer en una "vista final" un *magistrado distinto* al que presidió la vista inicial. Expresamos que ello tenía que ser así debido a que en la "vista sumaria inicial" el juez "no sólo ha estado expuesto y conoce parte de la prueba, sino que la ha evaluado, y en términos de probabilidades le ha adjudicado un valor y alcance probatorio contra el probando". Íd., pág. 732. Expresamos, por último, que este Tribunal entendía que tenían que intervenir dos (2) magistrados distintos porque aspiraba "a lograr que nuestro sistema de administración de justicia honre al máximo los postulados de neutralidad e imparcialidad en que se afianza". Íd., pág. 732.

En este aspecto, aún más dramática resulta ser la decisión que este Tribunal emitiera en *Pueblo v. Miranda Marchand*, 117 D.P.R. 303 (1986). Allí el juez que presidió el proceso contra el imputado de delito se reunió a solas, antes de empezar el juicio, con un compañero juez, quien resultaba ser el principal testigo de cargo. *No hubo prueba alguna en relación con el tema sobre el cual versó la conversación.* Luego de analizar, y ratificar, nuestra jurisprudencia anterior pertinente al asunto planteado, citamos

con aprobación decisiones del Tribunal Supremo de Estados Unidos a los efectos de que:

> "Un juicio justo en un tribunal imparcial es requisito básico del debido proceso de ley. La justicia desde luego exige la ausencia de un verdadero prejuicio al juzgar los casos. Pero nuestro sistema de derecho ha tratado siempre de evitar hasta la probabilidad de la injusticia. Con este propósito ninguna persona puede ser juez en su propio caso y no se le permite a nadie juzgar casos en cuyo resultado tenga interés. Tal interés no puede definirse con precisión. Deben considerarse las circunstancias y las relaciones. Este tribunal ha expresado, sin embargo, que 'todo procedimiento que pudiera servir de posible tentación a un hombre promedio como juez ... a no mantener un balance preciso, claro y verdadero entre el Estado y el acusado, le niega a éste el debido proceso de ley'. [Cita.] Una regla tan estricta puede en ocasiones impedir que actúen jueces que no están en verdad prejuiciados y quienes harían todo lo posible por mantener la balanza de la justicia en su fiel entre las partes litigantes. Pero para desempeñar su alta función de la manera más correcta 'la justicia debe satisfacer las apariencias de la justicia.'" *Tumey v. Ohio*, 273 U.S. 510, 532 (1927), según citado en *Pueblo v. Miranda Marchand*, ante, págs. 306–307.

Expresó este Tribunal, por último, que en "el caso de autos, la realidad es que el juez que presidió el caso se reunió a solas por casi una hora con el principal testigo de cargo, un magistrado compañero suyo, sin que estuvieran presentes el acusado ni sus abogados. Independientemente de los móviles —buena fe o ánimo de transacción— esa reunión amerita que revoquemos y ordenemos la celebración de un nuevo juicio. *Ello es un imperativo constitucional del debido procedimiento de ley*". (Énfasis suplido.) *Pueblo v. Miranda Marchand*, ante, pág. 307.

Después de este conciso resumen de la jurisprudencia de este Tribunal, emitida a lo largo de varias décadas y relevante al punto hoy ante nuestra consideración,[31] pro-

---

[31] Hemos omitido, de dicho resumen, la decisión que este Tribunal emitiera en *Pueblo v. González Navarrete*, 117 D.P.R. 577 (1986). Ello por razón de que la misma fue emitida vía el mecanismo procesal decisorio de la "sentencia"; la cual, como es sabido, no constituye precedente.

cede que nos preguntemos: *¿Cuál es la norma jurispruden-cial imperante hoy día en nuestra jurisdicción en este aspecto del derecho?*

La contestación, no hay duda, no es fácil. De primera intención, nuestras decisiones lucen un tanto contradictorias. Apenas que se examinen minuciosamente las mismas, sin embargo, las inconsistencias comienzan a desaparecer.

El punto de partida tiene que, por necesidad, ser la premisa básica originalmente establecida en *In re Marín Báez*, ante, a los efectos de que el *mero* hecho de que el juez haya tenido contacto previo con la prueba *no* incapacita a éste para ver el caso en los méritos y que en cada situación en que se haga ese planteamiento constitucional —violación del debido procedimiento de ley— se deberá considerar la totalidad de las circunstancias presentes en el caso en ese momento ante la consideración del tribunal.

Ahora bien, no hay duda que hay situaciones en que ese contacto previo con la prueba deja impresiones imborrables en la mente del juez ya sea por razón de que éste participa activamente en dicha etapa, examinando personalmente a los testigos, ya por razón de que dichos testigos son interrogados y contrainterrogados, de manera enérgica o fogosa por los abogados y fiscales, en la presencia del juez. Véanse: *In re Murchison*, ante; *Pueblo v. Toro Goyco*, ante. En relación con esas situaciones, *resolvemos que ante la posibilidad real indiscutible de que dicho magistrado haya formado opinión sobre la veracidad y suficiencia de lo declarado por dichos testigos, el juez debe inhibirse de participar en el juicio en su fondo del caso.* Veáse *Martínez Torres v. Amaro Pérez*, ante, pág. 732.

Distinta es la situación en que el contacto previo con la prueba de parte del juez se limita meramente a leer unas declaraciones juradas o unos informes. Esto es, en que su actuación, lejos de ser activa, es una pasiva que no

deja o causa impresión alguna en su conciencia de juzgador. Véanse: *Pueblo v. Quiles*, ante; *Pueblo v. Dones Arroyo*, ante. En esas situaciones, de ordinario no hay razón jurídica de peso para descualificar al magistrado de, posteriormente, presidir el juicio en su fondo, a menos que el acusado pueda demostrar afirmativamente el prejuicio o parcialidad que alega existe de parte del juez que presidió el proceso.

Establecida la norma, dirigimos nuestra atención hacia el caso hoy ante nuestra consideración. En el mismo se alega que el juez que presidió el juicio en su fondo no debió hacerlo por razón de que dicho magistrado había intervenido, y dilucidado, una moción que había radicado el apelante al amparo de las disposiciones de la Regla 64(p) de Procedimiento Criminal.(32)

En *Pueblo v. Tribunal Superior*, 104 D.P.R. 454, 459–460 (1975), expresamos que radicada "una moción para desestimar basada en la Regla 64 (p), el tribunal de instancia *puede en el ejercicio de su discreción señalar una vista para entender y recibir prueba, o puede rechazarla de plano* si de su faz y de las constancias en el expediente del caso, no resulta meritoria en cuanto al extremo de ausencia total de prueba"; ello, principalmente, debido a que la "determinación de causa probable goza, como toda determinación judicial, de la presunción legal de corrección ...." (Énfasis suplido.) Esto es, al amparo de las disposiciones de la Regla 64(p), 34 L.P.R.A. Ap. II, puede darse una u otra de las dos (2) situaciones antes mencionadas: contacto imborrable y directo por parte del juez con la prueba con

---

(32) Establece la citada disposición reglamentaria que:

"La moción para desestimar la acusación o la denuncia, o cualquier cargo de las mismas, sólo podrá basarse en uno o más de los siguientes fundamentos:

. . . . . . . .

"(p) Que se ha presentado contra el acusado una acusación o denuncia, o algún cargo de las mismas, sin que se hubiere determinado causa probable por un magistrado u ordenado su detención para responder del delito, con arreglo a la ley y a derecho." 34 L.P.R.A. Ap. II, R. 64(p).

que cuenta el Ministerio Fiscal, lo cual obliga a la inhibición, o, un contacto que no deja o causa impresión alguna en su mente, el cual no lo incapacita para poder presidir posteriormente el juicio en su fondo. Véanse, en adición: *Vázquez Rosado v. Tribunal Superior*, 100 D.P.R. 592 (1972); *Pueblo v. González Pagán*, 120 D.P.R. 684, 687 (1988).

Un examen de los autos del caso —y del recurso CE-89-133, *Pueblo v. López Guzmán*— revela que, radicada por la defensa la moción de desestimación bajo la Regla 64(p) de Procedimiento Criminal, ante, y habiéndose opuesto a la misma el Ministerio Fiscal, el juez de instancia rechazó la misma "de plano", acción para la cual estaba facultado. *Pueblo v. Tribunal Superior*, ante. Siendo así, y en vista de la norma antes expuesta, el referido magistrado podía intervenir en el juicio en su fondo del caso; ello por razón de que su participación, o contacto previo con la prueba, fue una mínima, sino ninguna, y pasiva. *Pueblo v. Quiles*, ante. En adición, tenemos que en el presente caso —distinto a los casos de *Toro Goyco* y *Miranda Marchand*— el juez que presidió los procedimientos *no* actuó como juzgador de los hechos, función que llevó a cabo el Jurado que intervino en el mismo. A esos efectos, véase *Pueblo v. Dones Arroyo*, ante.

## VII

Discutimos conjuntamente, por estar íntimamente relacionados los mismos entre sí, los señalamientos de error primero y segundo. En esencia, se alega que el Fiscal, durante sus turnos de informe al Jurado, comentó en varias ocasiones el silencio del acusado; situación que alegadamente se complica por razón de que no se ordenó que se grabaran, o se tomaran notas taquigráficas, de dichos informes. Ello, se alega adicionalmente, ha privado al apelante de su "derecho a una apelación efectiva".

 Constituye norma jurisprudencial reiterada y vigente en nuestra jurisdicción que:

> El derecho de un acusado a no declarar y a que tal circunstancia no establezca presunción alguna en su contra no debe ser invadido por el ministerio público con comentarios adversos ni insinuaciones de clase alguna. Si lo fuera, debe recibir del juez que presida el juicio la más severa e inmediata recriminación por conducta impropia; y el jurado instruído por la corte inmediatamente en forma apropiada, de suerte que en el ánimo de los juzgadores de hecho no pueda quedar vestigio alguno de tales comentarios vertidos ante ellos.[33]

 Un examen de la transcripción de evidencia revela que en varias ocasiones, durante los turnos de informe del Fiscal a los señores del Jurado, la defensa objetó por el fundamento de que el Fiscal, alegadamente, estaba comentando el silencio del acusado. Ello no obstante, de dichas intervenciones *no* surge, en forma alguna, en qué consistió dicho comentario, *si es que los mismos efectivamente se hicieron*. Sí surge de dicho récord que el magistrado siempre declaró *sin* lugar las objeciones que a esos efectos levantara la defensa. Impera, en consecuencia la norma a los efectos de que, en ausencia de prueba en contrario, se presume la corrección de los procedimientos y determinaciones judiciales. Véanse: *Otero Fernández v. Alguacil*, 116 D.P.R. 733 (1985); *Rabell Martínez v. Tribunal Superior*, 101 D.P.R. 796 (1973). Por otro lado, la ausencia de récord alguno al respecto, hace que dichos planteamientos no pasen de ser puras especulaciones.

 Por último, ya en cuanto al segundo señalamiento de error en específico, hemos resuelto que si la representación legal del acusado no solicita, del juez que preside los procedimientos, que se graben dichos informes al Jurado, se entiende renunciado dicho derecho. A esos efectos, veánse: *Pueblo v. Arroyo Núñez*, 99 D.P.R. 842 (1971); *Pue-*

---

[33] *Pueblo v. Díaz*, 69 D.P.R. 621, 629 (1949).

*blo v. Matos Pretto*, 93 D.P.R. 113 (1966); *Pueblo v. Vélez*, 77 D.P.R. 817 (1955).

## VIII

Mediante el sexto señalamiento de error, el apelante alega que se le negó su derecho a presentar prueba de defensa al denegarse la citación, como testigo de defensa, del juez que intervino en la vista preliminar; funcionario que alegadamente hubiera impugnado el testimonio "de un importante testigo de cargo".

 El derecho de todo acusado a presentar prueba o testigos a su favor es uno de rango constitucional, Const. E.L.A., ante; el cual derecho ha sido reconocido, inclusive, como obligatorio para los estados al amparo de las disposiciones de la Sexta Enmienda de la Constitución de los Estados Unidos. *Pueblo v. Acosta Escobar*, 101 D.P.R. 886 (1974).

El obstáculo con que se confronta este planteamiento surge del propio alegato del apelante. Al igual que en el caso de los alegados comentarios al silencio del acusado, *el planteamiento no encuentra apoyo en la transcripción de evidencia.* De hecho, el propio apelante admite que la solicitud que sobre la citación del testigo se hiciera, fue *retirada* por la defensa.[34]

## IX

Los señalamientos de error noveno y décimo son patentemente inmeritorios. Sólo basta una mera lectura de la relación de que de los hechos hiciéramos al comienzo de la ponencia para poder percatarnos del hecho que el Jurado *no* erró al condenar al acusado por lós delitos imputádoles a éste. La prueba es más que suficiente en derecho para

---

[34] Véase pág. 57 del Alegato del apelante.

sostener las convicciones decretadas a nivel de instancia. *Pueblo v. Cabán Torres*, 117 D.P.R. 645 (1986). Por otro lado, si no se cometieron ninguno de los errores señalados, *resulta imposible* que se haya violado "el derecho constitucional del acusado a un juicio justo e imparcial considerados en conjunto la totalidad de los errores de derecho cometidos en el caso de epígrafe". Apelación, pág. 2.

*Se dictará sentencia de conformidad.*

El Juez Asociado Señor Negrón García emitió una opinión concurrente, a la cual se unió el Juez Asociado Señor Fuster Berlingeri.

— O —

Opinión concurrente del Juez Asociado Señor Negrón García, a la cual se une el Juez Asociado Señor Fuster Berlingeri.

"El fenómeno psicoanalítico del problema de estimar credibilidad entre el testigo y el juez puede medirse desde distintas perspectivas. Para algunos magistrados es probable que la primera impresión o el primer testigo sea determinante. Sin embargo, no es *posible generalizar y concluir que evaluado el proceso integralmente, los jueces, mediante análisis sereno y criterio comparativo no puedan desprenderse de esa impresión original y entonces proceder a dirimir certeramente el alcance y veracidad de ese testigo a la luz de otros testimonios y demás prueba* ... de las vivencias aisladas individuales no nos es posible derivar razonablemente *generalizaciones fundadas.* Ni la ciencia de la psicología como tampoco las normas jurídicas apoyan esa tesis. No tenemos base para sostener la restrictiva visión de que la validez y corrección de dirimir credibilidad dependa exclusivamente del factor tiempo, de la memoria del juzgador o de su primera impresión *vis à vis* la

segunda. La psicogenética de juzgar es algo más complejo." *Pueblo v. Rivera Tirado*, 117 D.P.R. 419, 443–445 (1986).

Estos pronunciamientos nos impiden suscribir el análisis en torno a la alegada violación a juicio justo e imparcial por haberse ventilado el proceso ante un juez que había intervenido en un incidente anterior al juicio en su fondo. Nos explicamos.

## I

La decisión de hoy tiene el efecto negativo de inhibir automáticamente a todo juez ante cuya presencia se haya desfilado prueba *testifical* en incidentes para desestimar bajo la Regla 64(p) de Procedimiento Criminal, 34 L.P.R.A. Ap. II, y como corolario, para suprimir evidencia según la Regla 234 del mismo cuerpo, 34 L.P.R.A. Ap. II.

El fundamento decisorio mayoritario está fundamentado en la hipótesis de que el contacto previo con la prueba deja impresiones imborrables en la mente del juez. Opinión mayoritaria, págs. 896–897. A su vez se nos dice que esas "impresiones imborrables en la mente del juez" se configuran en los incidentes en que "participa activamente en dicha etapa, examinando personalmente a los testigos, ya por *razón de que dichos testigos son interrogados y contrainterrogados, de manera enérgica o fogosa por los abogados y fiscales*, en la presencia del juez". (Énfasis suplido.) Íd.

Lo *primero* que observamos es que se trata de un criterio intangible, de naturaleza subjetiva, muy escurridizo y de compleja apreciación. Lo *segundo*, no es difícil anticipar que el mismo será utilizado e invocado para, caprichosa y rutinariamente, descualificar a jueces sólo por razón de la "enérgica o fogosa" postulación de los abogados y fiscales. ¿No es esa la práctica forense común en el ámbito penal? Y lo *tercero*, la diferencia en los seres humanos no permite validar el razonamiento de "impresiones imborrables" en la mente de un juez, en virtud de oir unos testigos, *vis-á-vis*

declaraciones juradas o informes escritos. A fin de cuentas, para generar "impresiones descualificantes", en algunas personas, lo escrito puede tener el mismo o mayor impacto; como dice el refrán popular: "la palabra oral vuela, la escrita permanece."

## II

Nos adherimos, pues, a los pronunciamientos de *In re Marín Báez*, 81 D.P.R. 274, 287 (1959), seguido en *Pueblo v. Quiles*, 83 D.P.R. 63 (1961); *Pueblo v. Flores Valentín*, 88 D.P.R. 913, 914 (1963); *Pueblo v. Pacheco*, 83 D.P.R. 285 (1961); *Pueblo v. Martés Olán*, 103 D.P.R. 351 (1975), y *Pueblo v. Dones Arroyo*, 106 D.P.R. 303, 317 (1977), a los efectos de que, *salvo circunstancias de comprobado perjuicio específico*, no hay impedimento para que un mismo juez ventile un incidente previo y a su vez, posteriormente, presida el juicio en su fondo.

De gran contemporaneidad es la cita vertida en *Pueblo v. Pacheco*, supra, págs. 289–290 del caso de *Craven v. United States*, 22 F.2d 605 (1927), *cert.* denegado, 276 U.S. 627 (1928):

"A lo sumo, pues, el affidávit imputa un 'prejuicio' fundado en la evidencia producida en corte abierta durante el *primer juicio* y en nada más resolvemos que tal 'prejuicio' (si es que ha de considerarse éste un término apropiado para referirse a un estado mental bien formado, 255 U.S. 42, 41 S. Ct. 236, 65 L. Ed. 481) *no es personal*; es judicial. Lo 'personal' contrasta con lo judicial; caracteriza una actitud de origen extrajudicial, que se produce *non coram judice*. El término 'personal' caracteriza claramente el prejuicio que se ha de evitar. Es la palabra significativa contenida en el estatuto. Es deber de un juez que merezca ese nombre, derivar sus puntos de vista de la evidencia. El estatuto nunca contempló inhabilitar a nuestros tribunales mediante la descalificación de un juez, sobre la base única de un prejuicio (o estado mental, 255 U.S. 42, 41 S.Ct. 236, 65 L.Ed. 481) contra violadores de la ley, civil o penal, derivada de evidencia presentada en el curso de procedimientos judiciales en que dicho juez ha entendido. *Cualquiera otra interpretación*

*convertiría el estatuto en un escollo intolerable a una eficiente administración de los procedimientos judiciales, los cuales de por sí no son hoy día muy rápidos o efectivos.*

A base de la teoría ahora levantada, ningún juez estaría calificado para juzgar dos veces un mismo caso. No importa que el segundo juicio sea el resultado de no llegar a un acuerdo el jurado, por razones de incompetencia o aun de corrupción, o porque el juez que entendió en el caso declare con lugar una moción de nuevo juicio, o porque un tribunal de apelación sostenga un señalamiento de error. Si, como resultado del primer juicio, el juez adquiere un prejuicio o estado mental a favor o en contra de cualquiera de las partes, como desde luego ha de ocurrir, queda descalificado.

. . . . . . . .

Si, como aconteció en muchos de los casos reportados, se permitiese que este estatuto fuera usado por abogados excesivamente celosos, que empequeñecieren su deber profesional hacia el bienestar público y hacia el tribunal en su calidad de protector del derecho público, como un método para lograr una demora (*U.S. v. Fricke* [D.C.] 261 F. 541), y en muchos casos un nuevo juicio ante un juez que deberá acercarse, de novo, a problemas previamente considerados por otro juez (*Ex parte Am. Steel Barrel Co.*, 230 U.S. 35, 44, 33 S.Ct. 1007, 57 L.Ed. 1379) el estatuto habría de proveer inmunidad contra ataque únicamente a aquellos peleles amorfos que fueron condenados por el juez McReynolds por ser depositarios impropios del poder judicial (255 U.S. 43, 41 S.Ct. 236, 65 L.Ed. 481). Solamente los tímidos y los incompetentes, si es que los hay ahora o ha de haberlos en el futuro en la judicatura federal, estarían exentos de ser atacados bajo este estatuto." (Énfasis suplido.) Véase *Withrow v. Larkin*, 421 U.S. 35, 57 (1975).([1])

Los motivos de prejuicio, opinión formada o prejuzgamiento visualizados en la Regla 76 de Procedimiento Criminal, 34 L.P.R.A. Ap. II, de ordinario, no cubren la situación de decretos anteriores contra un acusado en procedimientos criminales. *Maret v. United States*, 332 F. Supp. 324 (D. Miss. 1971). *Tienen que ser de naturaleza personal o demostrarse satisfactoriamente una conducta*

---

([1]) En las jurisdicciones federal y estatal rige la doctrina de que la intervención y el conocimiento adquirido de la evidencia durante el procesamiento, no impide su ulterior participación en la vista en sus méritos. 13A *Wright, Miller and Cooper, Federal Practice and Procedure: Jurisdiction and Related Matters (Federal Question Jurisdiction —Diversity Jurisdiction)* Sec. 3542 *et seq.* (2da ed. 1984).

*que sugiera, de hecho, que existe cierta fricción u hostilidad
entre el juez y el litigante.* Véanse: *United States v. Carmi-
chael,* 726 F.2d 158, 160 (4to Cir. 1984); *Blizard v. Fielding,*
454 F. Supp. 318 (D. Mass. 1978), confirmado en *Blizard v.
Frechette,* 601 F.2d 1217 (1979).

> Debe hacerse una distinción entre una determinación judi-
> cial derivada de la prueba y de los procedimientos extensos
> ante una corte, y la determinación que no está fundamentada
> en hechos producidos en corte, sino en actitudes e ideas que se
> originan en fuentes externas al recinto judicial. No es suficiente
> para descualificar a un juez demostrar que hubo prejuicio o
> apasionamiento en unas expresiones de derecho hechas previa-
> mente por él, en una decisión anterior contraria al litigante o
> en resoluciones adversas durante el litigio. (Traducción nuestra
> y citas omitidas). *Maret v. United States,* supra, pág. 325.

De gran importancia es *United States v. Winston,* 613
F.2d 221, 223 (9no Cir. 1980), que expone la doctrina si-
guiente:

> *La Sec. 455 (b)(1)* [*equivalente al inciso (f) de nuestra Regla
> 76*] *por otro lado puede requerir la descualificación de un juez
> en situaciones en que éste tenga conocimiento de hechos del caso
> antes del juicio, independientemente de cualquier posible prejui-
> cio o parcialidad.* Sin embargo, en tales casos la descualifica-
> ción procede cuando la información se deriva de una *fuente
> extrajudicial.* El conocimiento obtenido en el transcurso de una
> participación anterior en el mismo caso no requiere que el juez
> se descualifique a sí mismo. *United States v. Grinnell,* 384 U.S.
> 563, 583, 86 S.Ct. 1698, 1710, 16 L.Ed.2d 778 (1966); *United
> States v. Carignan,* 600 F.2d 762, 763 (9no Cir. 1979); *United
> States v. Azhocar,* 581 F.2d 735, 739 (9no Cir. 1978), *cert.* dene-
> gado, 440 U.S. 907, 99 S.Ct. 1213, 59 L.Ed.2d 454 (1979); *In re
> Webster,* 382 F.2d 79, 84 (9no Cir. 1967); *Lyons v. United States,*
> 325 F.2d 370, 376 (9no Cir. 1963), *cert.* denegado, 377 U.S. 969,
> 84 S.Ct. 1650, 12 L.Ed.2d 738 (1964). (Traducción nuestra.)

## III

Las decisiones de *Martínez Torres v. Amaro Pérez,* 116
D.P.R. 717 (1985); *Pueblo v. Toro Goyco,* 84 D.P.R. 492
(1962), y *Pueblo v. Miranda Marchand,* 117 D.P.R. 303

(1986), no avalan la tesis mayoritaria de que el contacto oral previo, automática e indefectiblemente exige la descalificación ulterior del juez. Esos casos son claramente distinguibles. *Pueblo v. Toro Goyco*, supra, al igual que *Martínez Torres v. Amaro Pérez*, supra, versan sobre trámites —de ordinario *ex-parte*— de determinación de causa probable: uno para acusar de un delito y el otro para revocar *sumariamente* una sentencia suspendida a un convicto. A su vez, *Pueblo v. Miranda Marchand*, supra, gira en torno al inexplicable contacto con la prueba —reunión entre el perjudicado y el juez en *cámara*— antes de ventilarse el proceso. Esa reunión, no sólo fue también ex parte, sino por sus efectos, susceptible de caracterizarse como *extrajudicial*.

Para terminar, debemos recordar a F. Gorphe, *Las resoluciones judiciales: estudio psicológico y forense*, Buenos Aires, Eds. Jurídicas Europa-América, 1953, págs. 97–98:

> La comprobación judicial no es verdadera observación científica de los fenómenos, de la cual decía CLAUDE BERNARD: "El observador debe ser el fotógrafo de fenómenos ... Su espíritu debe ser pasivo, es decir, callarse; escucha a la naturaleza y escribe a su dictado". Aquí, la idea no cesa de obrar, incluso durante la comprobación, que permite comprender los hechos a medida que se presentan, y seleccionarlos, para solo dedicarse a los que presenten interés en la causa o, por lo menos, para ponerlos de relieve: la observación continúa mezclada con *apreciación*.
>
> En primer lugar es una apreciación *provisional*, que se precisa y robustece, *o se rectifica, a medida que se progresa en la reconstrucción de los hechos*. El desarrollo de la apreciación, para conservarse positivo, debe seguir el de las comprobaciones. *Tengamos cuidado con no olvidar que toda opinión que les precede no puede tener valor más que de hipótesis previa*. La frase de BERTILLON: "Sólo se ve aquello que se mira, y sólo se mira lo que se tiene en el espíritu", *constituye una verdad para los testigos, no un método para los jueces*. El juez no espera el cierre del debate *para intentar formarse una opinión, pero no debe formular su opinión sino al final*; y, si es preciso, tras haber modificado varias veces su manera de enfocar la situación. Su concepción provisional del asunto, la denomina con razón una *primera impresión: está formada de intuición y de sentimiento de derecho tanto como de comprobación*.

"Si el juez capaz (*tüchtige*) —explica el magistrado Zacharias— recoge los hechos de la causa escuchando, interrogando y averiguando, *la experiencia de la vida, la formación intelectual y el saber jurídico funcionan en él con indisoluble unidad.* Por acción de tales factores, se forma en seguida en su espíritu, natural y necesariamente, una impresión sobre el estado de derecho. Una de las partes parece tener para él razón en un punto; la otra en otro distinto". *Esa impresión o ese sentimiento del derecho (Rechtsempfinden, Rechtsgefühl),* que surge del contacto con los hechos de autos, antes de la aplicación consciente del derecho, expresa la reacción del juez ante tales hechos, por efecto de su mentalidad profesional y jurídica, de su experiencia y de sus ideas. Puede decirse acertadamente, con Zacharias, que se trata de un *juicio sumario,* formado por medio de un vistazo sobre el conjunto de la causa; *pero hay que detallar que se trata de un juicio de valor puramente elemental y provisional.* (Énfasis suplido y en el original, y escolios omitidos.)

En resumen, discrepamos de la conclusión de que el proceso judicial —y todos los incidentes correlativos— generados por mociones de diversa índole, que implican conocimiento o contacto previo con prueba oral, generan "impresiones imborrables" e inhabilitan automáticamente a un juez para presidir imparcialmente el proceso.