Colón Birriel, Juez Ponente
TEXTO COMPLETO DE LA SENTENCIA
I
José Ramón Figueroa (“el demandado” o “el peticionario”), acude mediante certiorari y solicita que revisemos la resolución emitida por el Tribunal de Primera Instancia, Sala Superior de Humacao, el 25 de febrero de 1999, archivada en autos copia de su notificación el 1 de marzo de 1999, en el caso de Carmen S. Cátala Cruz v. José Ramón Figueroa, Civil Núm. HAL89-0273, sobre alimentos. Mediante la referida resolución, se aprobó y adoptó en su totalidad el informe preparado por la Leda. Blanca Beauchamp de Jesús, Examinadora de Pensiones Alimentarias (“la Examinadora”).
En lo pertinente, en el Informe se recomendó aumentar a $800 la obligación alimentaria del peticionario para con dos de sus hijas. Se recomendó, además, se le ordenara al peticionario a pagar retroactivamente unos *832 $5,000.05 adeudados a virtud del aumento en la obligación alimentaria, y se expidiera orden de retención de su salario para satisfacer el pago de la pensión recomendada.
Mediante resolución emitida el 20 de abril de 1999 y notificada en esa misma fecha, le concedimos quince (15) días a Carmen S. Cátala Cruz, madre de las alimentistas (“la promovente” o “la recurrida”), para que se expresara. Ha transcurrido en exceso dicho término sin que ésta haya presentado escrito alguno. Así las cosas, resolvemos sin el beneficio de su comparecencia, pero no sin antes hacer un breve recuento de los hechos pertinentes al caso. Veamos.
II
El 4 de noviembre de 1997, Carmen A. Cátala Cruz, representada por la Procuradora de Relaciones de Familia, radicó ante el Tribunal de Primera Instancia, Sala Superior de Fajardo, Moción en petición de aumento de pensión alimenticia (sic), fijación de nueva, pensión provisional y otros extremos a favor de sus hijas Tamara y Yanira Figueroa, y su nieta, Meralys Figueroa, contra el padre y abuelo de éstas, el demandado-peticionario José R. Figueroa Pacheco. Mediante dicho escrito, expresó que la pensión vigente en aquel momento era de $216.50 quincenales y que estaba en término para revisarse; que las menores alimentistas Tamara y Yanira Figueroa tenían 15 y 14 años de edad, respectivamente, por lo que sus gastos eran mayores. Narró que Tamara había sido víctima de una violación y que como resultado de ésta había nacido Meralys Figueroa. Expresó que en virtud del Artículo 144 (3) y 145 del Código Civil, el peticionario venia obligado a suplirle alimentos a su nieta Meralys.
Según el escrito, las dos menores adolescentes necesitaban una pensión básica no menor de $450 cada una, más una pensión suplementaria, según las Guías para fijar pensiones alimentarias. Para la bebé, requirió una pensión provisional no menor de $150.
Luego de varios trámites procesales, incluyendo el traslado del caso para el Tribunal de Primera Instancia, Sala Superior de Humacao, el 27 de agosto de 1998 se celebró una vista sobre el estado de los procedimientos ante la Examinadora de Pensiones Alimentarias, Blanca Beauchamp de Jesús. En dicha vista, entre otras cosas, la Examinadora entendió procedente la desestimación de la reclamación de alimentos a favor de la pequeña Meralys, pero informó a la abuela de la niña, la aquí recurrida, sobre la radicación de un pleito independiente para ello. Se señaló vista para el 15 de noviembre de 1998, la que se pospuso a petición de la recurrida para el 11 de febrero de 1999.
El 11 de febrero de 1999, se celebró vista sobre aumento de pensión alimentaria producto de la cual fue el Informe de la Examinadora. En éste, se emitieron las siguientes determinaciones de hechos:

“1) Que José Ramón Figueroa Pacheco y Carmen Cátala Cruz procrearon dos hijas, Tamara y Yanira, quienes para esa fecha contaban con 17 y 16 años de edad, respectivamente.

2) Que mediante orden del 10 de junio de 1991 se le impuso al peticionario una obligación por concepto de pensión alimentaria montante a $100 semanales, $433.33 mensuales.

3) Que desde dicha fecha la cuantía no había sido revisada o modificada y que el transcurso de los años representaba un cambio significativo sustancial en la necesidad de alimentos de las menores que ameritaba la modificación de la pensión.

4) Que al momento de emitirse el Informe, las menores residían en compañía de su madre en una propiedad por la que no se pagaba suma alguna, pero por la cual la madre de las menores se encontraba en proceso de 
*833
adquirir mediante otorgamiento de hipoteca.

5) Que las menores estudiaban en instituciones públicas, por lo que no incurrían gastos en ese renglón.

6) Que no se incurría en gastos por concepto de cuido de las menores.

7) Que los demás gastos reportados por la promovente en su Planilla de Información Personal y Económica (‘’P.I.P.E. ”) se consideraban razonables, considerando las declaraciones de ésta durante la vista a los efectos de que: a) el gasto de $500 mensual reportado en concepto de compra de alimentos era incurrido por su grupo familiar de cuatro personas, b) el gasto mensual de $250 por concepto de compra de ropa beneficiaba a las dos menores y ala bebe, ye) aun cuando el peticionario poseía un plan médico en beneficio de las menores, Yanira padecía de asma y dermatitis y Tamara usaba espejuelos, por lo que se consideraban razonables los gastos médicos reclamados.

8) Que conforme a las determinaciones de hechos, se calculaba la necesidad alimentaria de las menores en $787.67 mensuales.

9) Que la promovente, la madre de las menores, se desempeñaba como empleada del Departamento del Trabajo, y que devengaba un ingreso bruto mensual de $984, $389 netos quincenales, equivalentes a $778 mensuales.

10) Que la promovente reportó incurrir en gastos personales en su beneficio y en beneficio de su nieta en un total de $1,095.17 mensuales, los que incluían gastos mensuales a favor de Alexis Rosado Cátala de 20 años de edad, hijo suyo, pero no del peticionario.

11) Que la promovente declaró sobre cuatro (4) deudas personales reportadas en su P.I.P.E. con un pago total mensual de $278, una de ellas ascendente a $75 en beneficio directo e indirecto de sus hijas. Las demás deudas, una de $135 mensuales beneficiaba a otro hijo suyo (pero no del peticionario) y una de $68 mensuales la beneficiaba sólo a ella.

12) Que la promovente no reportó capital alguno en su P.I.P.E.

13) Que la promovente, para sustentar la necesidad de modificar la pensión alimentaria, justificó el déficit descrito declarando que sus cuentas personales no se encontraban al día y que pagaba cuando podía.

14) Que mediante Moción en petición de aumento de pensión alimeticia (sic), fijación de nueva pensión provisional y otros extremos, la promovente solicitó el aumento de la pensión existente a la suma de $900 mensuales, manifestando conformidad durante la vista a que se revisara a la cantidad de $800 mensuales.

15) Que una tal Olga L. Adorno —representante autorizada de la Administración de Servicios Médicos de Puerto Rico y testigo de la promovente— declaró que el peticionario, médico de profesión, había otorgado un contrato de servicios médicos con la susodicha Administración el día 1 de agosto de 1998, vigente hasta el 30 de junio de 1999, por la cantidad de $1,300 mensuales y que estaba asignado al Centro de Diagnóstico y Tratamiento de Naguabo.

16) Que la Sra. Adorno explicó que la cuantía de $1,300 mensuales no era limitante, ya que el médico podía realizar servicios que sobrepasaran dicha suma.

*834
17) Que mediante su contrato, el peticionario había devengado unos $21,972.50 netos (luego de realizadas las deducciones mandatorias y/o permisibles bajo la Ley Especial de Sustento de Menores) durante el período comprendido entre el 1 de septiembre de 1998 al 15 de enero de 1999 (4.5 meses), equivalentes a $4,882.78 mensuales.

18) Que en cuanto a la fecha de vigencia del contrato suscrito, la Sra. Adorno declaró desconocer hasta qué fecha éste se podía extender, aseverando que al noventa (90) o noventa y cinco (95) por ciento se les renovaba el contrato original y que hasta el momento no había recibido queja alguna del funcionamiento del peticionario por su prestación de servicios.

19) Que la Sra. Adorno hizo hincapié en el hecho de que la Administración no rescinde automáticamente los contratos que se otorgan, sino sólo por justa causa, luego de conceder varias oportunidades para corregir las fallas que sean señaladas, concediendo facultad al contratado para rescindir el documento suscrito por justa causa.

20) Que durante su testimonio, el peticionario señaló que exigencias económicas le habían forzado a prestar servicios médicos en exceso de lo pactado y expresó temor de que una posible venta del Centro de Diagnóstico y Tratamiento de Naguabo —la cual se rumoraba— resultara en que no se honrara su contrato.

21) La Sra. Adorno declaró desconocer si el CDT se tenía o no a la venta.

22) Que declaró el peticionario que tenía ingresos adicionales como médico generalista en la práctica privada.

23) Que por dicha práctica generaba, según su P.I.P.E. y su testimonio, un ingreso mensual de $1,792, para un total de ingresos de $6,674.78.

24) Que sin someter evidencia alguna para ello, el peticionario declaró incurrir en un total de $2,077.66 mensuales en gastos operacionales para su práctica privada: a) renta de oficina --$400 mensuales; b) salario enfermera/asistente— $800 mensuales; c) teléfono oficina— $125 mensuales; d) stationary —$400 mensuales; e) seguro “malpractice"— $105 mensuales; f) contribución sobre ingresos —$150 mensuales; 9) patente— $13.33 mensuales ($160 anuales); h) seguro social —$84.33 mensuales ($253 cada tres (3) meses).

25) Reportó un total de gastos mensuales personales ascendentes a $1,993.42: a) $725 mensuales por concepto de plan de pago por deuda contributiva, y b) $180 mensuales por concepto de préstamo estudiantil.

26) Que su total de gastos mensuales fijos ascendía a $4,976.08.

27) Que el peticionario declaró poseer —aunque todavía no había podido formalizar el traspaso del mismo— un vehículo de motor valorado en $7,000.

28) Que más allá del vehículo, no tenía capital alguno.

29) Que por entender que su capacidad económica no le permitía satisfacer una cuantía mayor, se ofreció a satisfacer $600 mensuales en concepto de pensión alimentaria y continuar proveyéndoles el plan médico “First Medical”.

30) Que el peticionario había procreado un total de seis (6) hijos, cinco (5) de los cuales eran menores de 
*835
edad y que por dos (2) de ellos satisfacía una pensión alimentaria de $600 mensuales. ”

La Examinadora procedió a aplicar las disposiciones de la Ley Orgánica de la Administración para el Sustento de Menores, las Guías para determinar y modificar pensiones alimenticias [sic] en Puerto Rico y el Código Civil. Hecho ésto, concluyó que, además de haber transcurrido tres (3) años desde la imposición de la pensión anterior, habían ocurrido cambios significativos sustanciales que ameritaban la modificación de la pensión.
Para determinar la nueva pensión, tomó la suma de $778 como salario base de la promovente, con el cual ésta proveía alimentos en beneficio de tres (3) menores de edad. Razonó que el peticionario contaba con $6,674.78 mensuales y que estaba obligado a alimentar a cinco (5) menores de edad sin incurrir en gasto suplementario alguno. Concluyó la Examinadora que surgía una obligación básica alimentaria en beneficio de Tamara y Yanira de $1,530.10 mensuales, la cual se presumía justa y razonable.
Dicho esto, la Examinadora procedió a explicar que dicha presunción había quedado destruida por la prueba presentada. Expresó que no se había establecido una necesidad de alimentos que justificara la imposición de dicha suma, por lo que la misma no debía prevalecer. Tomando en consideración la necesidad alimentaria de las dos menores, la escasa capacidad económica de la promovente, la capacidad económica del peticionario, y el hecho de que la suma solicitada por la promovente era sustancialmente menor, la Examinadora concluyó procedente declarar la solicitud “Con Lugar” en todos sus extremos.
Así las cosas, la Examinadora recomendó se aumentara la obligación alimentaria del peticionario a $800 mensuales, suma a ser depositada en la Unidad de Servicios de A.S.U.M.E., efectivo el 4 de noviembre de 1997. Ordenó al peticionario a saldar en el término de noventa (90) días la deuda de $5,500.05 acumulada hasta febrero de 1999. La Examinadora también recomendó se expidiera una orden de retención de salario para el pago de la pensión recomendada, ordenando que la misma se depositara directamente en la Unidad de Servicios de A.S.U.M.E., hasta tanto no se ejecutara la Orden de Retención de Salario, so pena de sanciones.
Mediante su resolución de 25 de febrero de 1999, Nélida Jiménez Velázquez, J. aprobó y adoptó el informe de la Examinadora en su totalidad. Dicha resolución fue notificada el 1 de marzo del corriente. Oportunamente, el 15 de marzo, el peticionario solicitó reconsideración. Al no recibir respuesta a la misma, acudió a este Tribunal.
El peticionario señala la comisión de los siguientes errores, los que transcribimos a continuación:

“1. Erro [sic] el Tribunal de Primera Instancia, Sala Superior de Humacao [sic] al determinar que las menores tenían [sic] una necesidad de alimentos mayor, al igual que un ingreso menor del empleo de la demandante a la que surge de la planilla de información personal y económica de fecha 23 de octubre de 1997 y que no concuerda con la Planilla que radica el mismo día de la vista, o sea, el 11 de febrero de 1999. (Se unen ambas planillas).

2. Erró el Tribunal al tomar en cuenta unos gastos medicos extraordinarios, cuando el demandado le provee un plan médico completo para dichas menores que cubre dichos gastos extraordinarios, según determinación de hechos número 7 (c). (Se une la carta del plan que indica lo cubre y que se unió la moción de recosideración).

3. Erró el Tribunal al tomar en cuenta los gastos personales de la demandante a los fines de sustentar la necesidad de modificar la pensión. (Determinación de hechos número 13).

*836
4. Erró el tribunal [sic] al tomar una determinación de vivienda a base de una posibilidad. (Determinación de hechos número 4).

5. Erro [sic] el Tribunal al tomar en cuenta las guardias adicionales que hace el demandado, ya que éstas [sic] guardias no dependen de éste, sino de los demás medicos [sic] que hacen las guardias y dividida en 4.5 meses, cuando la suma que se la garantiza por el contrato de guardias es distinta, (Ver determinación de hechos número 17 [sic], y al no tomar en cuenta los gastos operacionales necesarios de la oficina privada como médico que tiene el demandante, no el plan de pago de Contribuciones que le hizo el Departamento de Hacienda ascendente a $725.00 mensuales. (Se une copia de las guardias y del Plan de pago).

6. Erro [sic] el Tribunal al no aceptar la declaración de Ms. Adorno con relación a las guardias garantizadas por contrato y sin embargo acepto [sic] el que no se sabía si se vendía o cerraba operaciones el hospital y entonces ya no habría ni siquiera las guardias garantizadas. ”

III
Debemos enfatizar desde un principio que este Tribunal no intervendrá con las determinaciones de hecho ni con la adjudicación de credibilidad que haga el Tribunal de Primera Instancia, salvo que éste haya incurrido en pasión, prejuicio, parcialidad o error manifiesto. Véase López Vicil v. I.T.T. Intermedia, Op. del 4 de abril de 1997, 97 J.T.S. 42; Monllor Arzola v. Sociedad Legal de Gananciales, Op. del 13 de junio de 1995, 95 J.T.S. 77. Queremos también aclarar que, en ausencia de prueba en contrario, se presume la corrección de los procedimientos y determinaciones judiciales. Pueblo v. López Guzmán, 131 D.P.R. 867, 898 (1992).
La obligación de los padres de alimentar a sus hijos emana de los Artículos 143 y 153 del Código Civil, 31 L.P.R.A. 562 y 601. Mientras el Artículo 143 se refiere a la obligación alimentaria entre parientes, el Artículo 153 establece la obligación que tienen los padres, en el ejercicio de su patria potestad, para con sus hijos.
Cuando el padre alimentante no tenga la patria potestad sobre el alimentista y éste no viva en su compañía, como ocurre en el presente caso, su obligación alimentaria estaría reglamentada por el Artículo 143, 31 L.P.R. A. sec. 562. Bajo esas circunstancias, el deber de proveer alimentos dependerá de las necesidades alimentarias del alimentista y la capacidad del alimentante para satisfacerlas. Artículo 146 del Código Civil, 31 L.P.R.A. sec. 565. Cuando la obligación de proveer alimentos recaiga sobre dos o más personas, el pago de la pensión se repartirá entre éstos en proporción a sus respectivos caudales. Artículo 145 del Código Civil, 31 L.P.R.A. sec. 564, véase Guadalupe Viera v. Morell, 115 D.P.R. 4, 11-13 (1983).
Para fijar una pensión alimentaria, el Artículo 19 de la Ley Especial de Sustento de Menores (“L.E.S.M.”), 8 L.P.R.A. sec. 518, exige el uso de las Guías para determinar y modificar pensiones alimenticias [sic] en Puerto Rico. En tomo al uso de las Guías, el referido Artículo dispone lo siguiente:

“Se presumirá que la pensión alimentaria resultante de la aplicación de las guías es justa, adecuada y en el mejor interés del menor. Dicha presunción podrá ser controvertida por cualesquiera de las partes utilizando los criterios establecidos por el Estado Libre Asociado de Puerto Rico. Si a base de la evidencia presentada para rebatir la presunción, el tribunal o el Administrador, según sea el caso, determinara que la aplicación de las guías resultara en una pensión alimentaria injusta o inadecuada, así lo hará constar en la resolución o sentencia que emita y determinará la pensión alimentaria, luego de considerar, entre otros, los siguientes factores:

(1) Los recursos económicos de los padres y el menor;

*837
(2) la salud física y emocional del menor, y sus necesidades y aptitudes educacionales o vocacionales;

(3) el nivel de vida que hubiera disfrutado el menor si la familia hubiera permanecido intacta;

(4) las consecuencias contributivas para las partes, cuando ello sea práctico y pertinente, y

(5) las contribuciones no monetarias de cada padre al cuidado y bienestar del menor. ”

También hará constar cuál hubiera sido el monto de la pensión resultante al aplicar las Guías Mandatorias para Fijar y Modificar Pensiones Alimentarias en Puerto Rico adoptadas, según dispone este Capítulo.
El primer señalamiento de error requiere que examinemos si el foro a quo determinó correctamente la necesidad alimentaria de las menores y el ingreso de la madre de éstas. En su discusión de este error, el peticionario se dedica primordialmente a exponer la diferencia entre los Artículos 143 y 153 del Código Civil, 31 L.P.R.A. secs. 562 y 601, y a alegar que el foro recurrido fundamentó su decisión en el Artículo 153, el Artículo incorrecto.
Refleja el informe de la Examinadora que ésta sí hizo referencia al Artículo 153, 31 L.P.R.A. sec. 601. Véase la página 10 del Informe, nota al calce 7. No obstante haber citado el Artículo equivocado, los argumentos en que basa su decisión se rigen correctamente por las disposiciones del Artículo 143, 31 L.P.R.A. sec. 562: Las necesidades de las alimentistas y la capacidad económica del alimentante. Esto surge cabalmente de las páginas 9 y 10 del Informe:
“... procedemos a aplicar las Guías para fijar o modificar pensiones alimenticias [sic] en Puerto Rico al presente caso, tomando como base a la promovente un ingreso neto mensual disponible en la suma de $778.00 [sic] con el que queda obligado [sic] a proveer alimentos en beneficio de tres (3) menores de edad [Determinaciones de Hechos números nueve (9) y diez (10)] y al requerido de $6,674.78 [Determinaciones de Hechos números diecisiete (17) y veintitrés [sic] (23)] con el que queda obligado a proveer alimentos en beneficio de cinco (5) menores de edad [Determinación de Hechos número treinta (30)] sin que se incurra ert gasto suplementario alguno [Determinaciones de Hechos números cuatro (4), cinco (5) y seis (6)]. Surge así una obligación básica alimenticia [sic] en beneficio de las menores Tamara y Y anira Figueroa Cátala en la suma de $1,530.10 mensuales, la que se presume justa y razonable.
Sin embargo, ajuicio de esta Examinadora, dicha presunción quedó destruida por la prueba sometida ante nuestra consideración. En el presente caso no se estableció una necesidad de alimentos de las menores procreadas por las partes que justifique su imposición, por lo que entendemos la misma no debe prevalecer. En su defecto, considerando la necesidad de alimentos de las menores procreadas si establecida [Determinación de Hechos número ocho (8)]; la escasa capacidad económica de la promovente para proveer la misma [Determinaciones de Hechos números nueve (9), diez (10), once (11) y trece (13)]; la capacidad económica establecida del aquí requerido en la que incluso surge un sobrante [Determinaciones de Hechos números diecisiete (17), veintitrés (23), veinticuatro (24), veinticinco (25) y veintiséis (26)] y la solicitud de la promovente en cuantía sustancialmente menor, a juicio de esta Examinadora, debe declararse Con Lugar la solicitud de ésta en todos sus extremos sin trámite ulterior. ” (Nota omitida).
El peticionario también argumenta que la necesidad alimentaria de las menores, según determinada por la Examinadora, es excesiva. Entiende que esto es así, ya que se tomaron en cuenta unos gastos que no son incurridos por las menores (sino por su madre y otros miembros de la familia) y unos gastos médicos extraordinarios que supuestamente están cubiertos por el plan médico que él les proporciona.
*838 No surge del informe de la Examinadora que al determinar la necesidad alimentaria de las menores hubiese incluido en su cálculo gastos pertinentes a otros miembros de su grupo familiar. El informe meramente expresa que esos gastos existen.
El peticionario también señala una divergencia entre las dos Planillas de Información Personal, en tomo a los ingresos de la promovente. Surge del informe de la Examinadora que la promovente no acompañó con su planilla talonario alguno que comprobara sus ingresos. Véase página 2 del informe, nota al calce 2. No obstante, la Examinadora resalta que el peticionario no refutó los ingresos de ésta. Así las cosas, no puede levantar el argumento ante nosotros. Trabal Morales v. Ruiz Rodríguez, 125 D.P.R. 340, 351 (1990).
En cuanto a los gastos médicos extraordinarios en que incurren las menores (por motivo del asma y la dermatitis de Yanira y los espejuelos de Tamara), el peticionario entiende que no existen, ya que el seguro médico que mantiene a favor de éstas los sufraga. El peticionario nos refiere a una carta del seguro, International Medical Card, de la cual alegadamente surgen los servicios que cubre el plan. Examinada ésta, notamos que no incluye, ni medicamentos, ni lentes o monturas. La única referencia a espejuelos en dicha carta surge de una nota escrita a mano y en una letra no identificada que expresa lo siguiente: “La cubierta visión PVC cubre lentes y hasta lentes de contacto”. Demás está decir que dicho apunte no constituye prueba.
Nuestra discusión hasta el momento, aunque dedicada al primer señalamiento de error, resulta haber atendido el segundo y el tercero. No obstante, nos interesa discutir un poco más a fondo el tercer señalamiento de error. En éste, el peticionario nos refiere a la determinación de hechos número 13 del Informe en apoyo a sU contención de que el tribunal tomó en cuenta gastos personales de la peticionaria para sustentar el aumento. Examinada esa determinación, notamos que ésta se limita a explicar que la peticionaria tiene recursos limitados. Esto no sustancia de forma alguna el argumento del peticionario.
Dicho esto, debemos añadir que la referida determinación de hecho es pertinente en cuanto ayuda a definir la capacidad económica de la promovente. Es importante conocer esta capacidad, ya que cuando la obligación de suministrar alimentos recae sobre dos o más personas, como ocurre en el presente caso, se repartirá entre ellos el pago de la pensión en cantidad proporcionada a su caudal respectivo. 31 L.P.R.A. 564.
El cuarto señalamiento de error tampoco tiene fundamentos. No tenemos prueba de que la Examinadora haya tomado en consideración el pago de hipoteca por la residencia de las menores. En la determinación de hechos número 4, a la cual nos refiere el peticionario, la Examinadora simplemente se limita a establecer qüe las menores residen en una propiedad por la cual la promovente no satisface canon alguno, aunque se encuentra en trámites de adquirirla mediante otorgamiento de hipoteca. No surge que la Examinadora haya aceptado» como hecho probado que las menores residían en propiedad por la cual se pagaba hipoteca. Tampoco hace determinación alguna en cuanto al monto de la hipoteca, la cual alegadamente asciende a $500 mensuales (véase P.I.P.E. de Carmen S. Cátala Cruz, del 11 de febrero de 1999, apéndice VIII del recurso).
En su quinto señalamiento de error, el peticionario indica que el tribunal erró al tomar en cuenta las guardias adicionales que hace, cuando éstas no dependen de él, sino de que los demás médicos no hagan guardias.
Dado que la cuantía de la pensión dependerá en parte de la capacidad económica del alimentante, impera que esta capacidad se descubra completamente. La L.E.S.M. define el concepto ingresos ampliamente para que no quede "... duda alguna de que deberá recurrir se a todas la fuentes concebibles de las cuales el alimentante derive ingresos, y además a su capital y a la totalidad de su patrimonio”. Sarah Torres Peralta, La Ley Especial de Sustento de Menores de 1994 y el Derecho de Alimentos en Puerto Rico, Sañ Juan, Publicaciones *839 S.T.P., Inc., Edición Especial 1997, pág. 2.6.
Las secciones 501 (16) y (17) de la L.E.S.M. definen los términos “ingresos” e “ingreso neto”. A continuación transcribimos ambos in extenso:

“(16) Ingresos.— Comprende cualquier ganancia, beneficio, rendimiento o fruto derivado de sueldo, jornales o compensación por servicios personales, incluyendo la retribución recibida por servicios prestados como funcionario o empleado del Estado Libre Asociado de Puerto Rico, del Gobierno de los Estados Unidos de América, según lo permitan las leyes y reglamentos federales aplicables, de cualquier estado de la Unión de los Estados Unidos de América, o de cualquier subdivisión política de los mismos, o de cualquier agencia o instrumentalidad de cualesquiera de las mencionadas entidades en cualquiera que sea la forma en que se pagaren; o de profesiones, oficios, industrias, negocios, comercio o ventas; o de operaciones en propiedad, bien sea mueble o inmueble, que surjan de la posesión o uso del interés de tal propiedad; también los derivados de interéses, rentas, dividendos, beneficios de sociedad, valores o la operación de cualquier negocio explotado con fines de lucro o utilidad; y ganancias, beneficios, rendimientos, fondos, emolumentos o compensación derivados de cualquier procedencia, incluyendo compensaciones por desempleo, compensaciones por incapacidad, beneficios de retiro y pensiones o cualquier procedencia, incluyendo compensaciones como contratista independiente, compensaciones por desempleo, compensaciones por incapacidad, beneficios de retiro y pensiones o cualquier otro pago que reciba un alimentante de cualquier persona natural o jurídica.

(17) Ingreso neto.— Aquellos ingresos disponibles al alimentante, luego de las deducciones por concepto de contribuciones sobre ingresos, seguro social y otras requeridas mandatoriamente por ley. Se tomarán en consideración, además, a los efectos de la determinación del ingreso neto, las deducciones por concepto de planes de retiro, asociaciones, uniones y federaciones voluntarias, así como los descuentos o pagos por concepto de primas de pólizas de seguros de vida, contra accidentes o de servicios de salud cuando el alimentista sea beneficiario de éstos. La determinación final se hará según toda la prueba disponible, incluyendo estimados, estudios y proyecciones de ingresos, gastos, estilo de vida y cualquier otra prueba pertinente. ”

En tomo a la determinación del ingreso de un alimentante, y haciendo referencia a casos como López v. Rodríguez, 121 D.P.R. 23 (1988) y Viera v. Moréll, 115 D.P.R. 4 (1983), nos explica Torres Peralta, supra, a la página 2.2, lo siguiente:
“La determinación respecto a la capacidad económica del alimentante y a la necesidad del alimentista es siempre una cuestión de hecho que queda generalmente al juicio prudente y discreción del juzgador. Para hacer tal determinación, el tribunal no está limitado por la prueba documental y oral que recibe en la vista. Puede recurrir a evidencia circunstancial, tomar en cuenta el estilo de vida del alimentante y también la realidad de la economía subterránea que prevalece en Puerto Rico. ” (Notas omitidas)
El caso de López v. Rodríguez, supra, a la página 33, también resuelve que al fijar la cuantía de la pensión alimentaria se debe tomar en cuenta la capacidad del alimentante para generar ingresos y la naturaleza de su empleo y profesión. Torres Peralta, supra, a la página 2.26, expresa que si el alimentante tiene capacidad para trabajar, el hecho de que no esté trabajando o generando ingresos en ese momento no es óbice para que el tribunal le imponga el pago de una pensión. Añade que “[djeberá tomarse en cuenta su aptitud para tener ingresos considerando su preparación académica, su capacidad física e intelectual para trabajar, la naturaleza de las profesiones y oficios que puede ejercer, y demás criterios pertinentes”. Idem.
*840 No surge del expediente ante nosotros que el peticionario está de alguna forma incapacitado para ejercer su profesión de la medicina. Además, estamos seguros que su preparación académica y la naturaleza de su profesión le abren las puertas a un sinúmero de oportunidades laborales más allá de las guardias del CDT de Naguabo. La amplitud del concepto ingreso, según la L.E.S.M., en conjunto con la capacidad del peticionario para generar un ingreso nos convence de que no erró el foro a quo.
Dentro del señalamiento de error número 5, el peticionario impugna el que no se haya tomado en cuenta los gastos operacionales de su oficina privada o su plan de pago por concepto de contribuciones con el Departamento de Hacienda. Surge de las conclusiones de derecho de la Examinadora, página 10 del Informe, que ésta sí consideró los gastos operacionales de la oficina privada del peticionario, así como el plan de pago de contribuciones. Allí nos refiere a las determinaciones de hecho número 17, 23, 24, 25 y 26, donde plasmó los ingresos y gastos del peticionario —incluyendo los de su oficina y el pago de contribuciones — , y señala que “surge un sobrante”. Obviamente, tomó en consideración los gastos del peticionario al calcular su capacidad económica. Por lo tanto, no se cometió el error.
En su sexto y último señalamiento de error, el peticionario aduce que el foro de instancia debió haber aceptado la declaración de la Sra. Adomo en cuanto a las guardias garantizadas por contrato y no su declaración de que no sabía que el CDT iba a cerrar.
En su discusión del error, se limita a acusar que el tribunal tomó su ingreso de las guardias como uno fijo, cuando en realidad depende de otras personas, y que en junio de 1999 la agencia que lo contrata cerrará operaciones, por lo que se quedará sin las guardias. Como prueba del cierre, el peticionario incluye en su apéndice una carta del 22 de enero de 1999 remitida por la Secretaria de Salud. Esta carta refleja que el 7 de agosto de 1998 se aprobó la Ley Número 187, la cual dispone el cierre de las operaciones de la Administración de Facilidades y Servicios de Salud efectivo el 30 de junio de 1999.
No nos hace sentido el señalamiento del peticionario en cuanto a que el foro recurrido no aceptó la declaración de la Sra. Adomo sobre las guardias garantizadas por contrato. La Sra. Adomo declaró que el peticionario había otorgado un contrato de servicios médicos con la Administración de Servicios Médicos de Puerto Rico vigente desde el 1 de agosto de 1998 hasta el 30 de junio de 1999 por la cantidad de $1,300 mensuales. Aunque no aparece en el recurso ante nosotros, entendemos que dicho contrato fue admitido en evidencia como Exhibit I. Véase página 4 del Informe. La Sra. Adorno añadió que dicha cuantía no era limitante, ya que el peticionario podía brindar servicios adicionales.
Esto fue confirmado cuando se analizaron los ingresos del peticionario entre el período de cuatro meses y medio comprendido entre el 1 de septiembre de 1998 al 15 de enero de 1999. Se determinó que, luego de las deducciones mandatorias y permisibles, éste había tenido un ingreso promedio de $4,882.78 mensuales. Para calcular este promedio era necesario dividir el ingreso neto total de ese período, $21,972.50, por el número de meses: 4.5. Contrario al entender del peticionario, no procedía dividir por otro número.
De la determinación/de hechos número 20 surge que el peticionario confirmó lo declarado por la Sra. Adomo, expresando que las exigencias económicas le habían forzado a prestar servicios médicos en exceso de lo pactado. Nos parece que la Examinadora y el foro de instancia, no solamente aceptaron la versión de la Sra. Adomo, sino que la misma fue confirmada por el propio peticionario. A éste no le asiste la razón al señalar como error lo aseverado.
No erró el tribunal recurrido al aceptar que no se sabía si se vendía o cerraba operaciones el hospital. En cuanto a ese asunto, el propio peticionario declaró estar preocupado por “rumores” de la venta, por lo que él *841 tampoco sabía a ciencia cierta lo que iba a ocurrir (véase determinación de hecho 20). Sin lugar a dudas, la carta que trae a este Tribunal no estaba en su posesión, ni fue presentada en prueba durante la vista del 11 de febrero de 1999. No había prueba de ello; por lo tanto, no erró el foro recurrido al aceptar que no se sabía si el hospital vendía o cerraba operaciones.
Aunque no lo enumera como uno de sus señalamientos de error, el peticionario nos suplica que se le conceda un plan de pago para saldar su deuda retroactiva.
Entendemos que el saldo total de $5,500.05 en noventa (90) días, según dispone el tribunal de instancia, es oneroso para el peticionario, por lo que procedemos a concederle un plan de pago. El peticionario vendrá obligado a abonarle a su deuda retroactiva acumulada de $5,505.05, la suma mínima de $229.17 mensuales por los próximos veinticuatro (24) meses. Dicha suma será adicional a la pensión determinada de $800 mensuales, la cual hemos encontrado correcta.
Más allá de esto, no detectamos fundamento alguno que justifique alterar la Resolución recurrida. Así modificada, expedimos el auto, confirmando dicha Resolución en cuanto a sus demás aspectos.
Notifíquese inmediatamente.
Así lo acordó el Tribunal y lo certifica la señora Secretaria General.
Aida Ileana Oquendo Graulau
Secretaria General